*In re* F.H., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. F.H., a Minor, Respondent-Appellant).

First District (4th Division)   No. 1—87—0455

Opinion filed October 19, 1989.

Randolph N. Stone, Public Defender, of Chicago (Ellen Fishbein and Hugh Stevens, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Marilyn F. Schlesinger, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Following a bench trial, respondent was found delinquent of criminal sexual abuse, adjudicated a ward of the court and sentenced to one year probation and 10 consecutive weekends in the Juvenile Detention Center, which was later reduced to five weekends. On appeal, respondent contends that (1) the delay between the filing of the delinquency petition and the adjudicatory hearing violated his constitutional right to due process; (2) the testimony of the minor complainant was so inconsistent and uncorroborated as to be insufficient to prove him guilty beyond a reasonable doubt; and (3) the trial court abused its discretion by restricting his cross-examination of the complainant's mother regarding a prior false statement and possible bias.

On June 21, 1985, a petition for adjudication of delinquency and wardship was filed charging respondent, then 15 years old, with aggravated sexual assault, based on sexual intercourse, of the nine-year-old complainant (K.D.), on or about March 9, 1985. A probable cause hearing was held on June 27, 1985, at which Chicago police officer Massey testified that in response to his questions on the night of June 20, 1985, K.D. described an act of sexual contact performed upon her by respondent sometime after her birthday which, Massey testified, is April 15. She further recounted that respondent's sister, Charlene, entered the room during the incident and pulled respondent off of her. In her testimony, Charlene denied that she witnessed or extricated K.D. from any such assault. Following the hearing, the State was granted leave, over respondent's objection, to amend the petition to allege that the offense occurred "on or about April 17, 1985." The trial court found probable cause and released respondent to the custody of his mother.

The case was set for July 22, 1985, on which date respondent re-

quested a continuance to substitute private counsel for the public defender and because his mother was hospitalized. The trial court continued the case to August 5 for the appearance of private counsel and to set a trial date. On that date, respondent's father advised the court that the family had determined it could not afford private counsel and that respondent's mother would be convalescing from surgery for about 30 more days. The public defender then requested a date for trial, and the matter was continued by agreement to September 4 for a trial on the merits. When K.D. and her mother failed to appear for trial on September 4, the State requested "one final continuance." Defense counsel stated that he had no strong objection so long as the case was marked "final."

The case was continued, on the State's motion, to October 11 and marked "final." Due to problems with the court's schedule on October 11, the case was continued to December 19. On that date, the State advised the court that it had not yet received K.D.'s emergency room records and requested that the case be continued to late January. Over defense counsel's objection, the case was continued to January 31, 1986. When the parties appeared on January 31, the State informed the court that it had still not obtained the medical records and asked for another continuance, stating that it would be prepared for trial "without fail" on the next date. The trial court granted the State's motion but admonished the assistant State's Attorney that "with or without medical records, we will proceed to trial" on March 13.

On March 13, defense counsel answered ready for trial and requested that the State either go forward with its case or that the matter be dismissed. The State, however, requested another continuance for the reason that K.D.'s mother was unable to accompany her to court because of certain medication she was taking. Defense counsel moved for dismissal, arguing that contrary to the State's representation, K.D. had not been present on every preceding court date; that respondent and representatives of his family had been in court on at least eight prior occasions; that he (counsel) had been answering ready for trial for several months; and that the numerous and extensive delays in the case had served to deprive respondent of his constitutional rights to due process and equal protection. The trial court noted the numerous continuances notwithstanding that the case had been marked "final" on several preceding occasions, but denied respondent's motion to dismiss and granted the State's motion for a continuance to April 29.

On that date, without prior notification to defense counsel, the as-

sistant State's Attorney stated that because several other cases already in progress involving minors in custody had been scheduled for hearing that afternoon, she had elected, with permission from the court, not to begin the trial on this case and had told K.D. and her mother not to come to court that day. Defense counsel objected, arguing that respondent and his family had been severely hardshipped by the numerous continuances of this case. The trial court apologized to defense counsel and respondent's family, noting that the case had been pending for "an unusually long time"; that respondent had come to court on each and every scheduled court date; and that there had been other occasions on which defense counsel also was not notified of delays in the proceeding. The court also confirmed, however, that it had informed the State that the other cases in progress were to take precedence over any others scheduled for that day. The court stated that it would accept responsibility for the failure to go to trial on that date and, over defense counsel's objection, continued the case to June 18.

Prior to trial on June 18, defense counsel renewed his motion to dismiss on the grounds that respondent had been deprived of his constitutional rights to due process and equal protection by the numerous continuances and resulting delays in the trial of this case. The motion was denied, and trial commenced.

K.D. testified that her ninth birthday was March 15, 1985. She and her mother lived with her mother's family next door to respondent's family. She played with respondent's 13-year-old sister, Charlene, almost every day. K.D. testified that she had been inside the home occupied by respondent, Charlene, and other members of respondent's family on several occasions, and she described the number and location of rooms in the house.

When asked by the assistant State's Attorney to describe the events of April 17, 1985, K.D. testified that at approximately 2:30 p.m., she and Charlene went to Charlene's house. She could not recall if she attended school that day but she did remember it being a very hot day. While they were watching television in Charlene's first-floor bedroom, Charlene's mother called Charlene to the basement, where she had gone to wash clothes. A few minutes later K.D. looked out of the door and saw a leg going up the stairs. Thinking it was Charlene, she followed the person up the stairs. When she looked into respondent's bedroom, he grabbed her right arm and threw her on his bed. He stood in front of her as she lay on her back and pulled her jeans and underwear down to her shoes. After pulling down her underwear, he pulled down his underwear and performed an act of sexual inter-

course. During the performance of the act Charlene entered the room and pulled her out from under respondent, threatening respondent that she was going to tell their mother. As she pulled up her clothing, respondent told her and Charlene not to tell anybody. She was very frightened and began to cry. Several weeks later, on June 20, she related the incident to her mother, whereupon her mother took her to a hospital where she underwent a pelvic examination. She did not tell her mother what had happened earlier because she was afraid and confused.

On cross-examination, K.D. denied that she had told a police officer the incident occurred on either March 9 or May 27, 1985; and she did not recall telling hospital personnel on June 20 that the incident had occurred a few weeks earlier. The only date she ever mentioned was April 17. She also stated that she did not ever visit the home of respondent and his family after April 17. She did not resist respondent or scream when he threw her on the bed, and she did not try to get up while he was removing his pants. She stated that she did not know the words "penis" and "vagina," terms used when she testified, at the time of the incident and acknowledged using other words when she described the genital contact to the police; however, she denied that anyone told her the correct words. On redirect examination, K.D. explained that she did not scream or resist respondent because she was afraid and because he was too heavy.

K.D.'s mother testified that on June 20, 1985, she had a conversation with Charlene after which she questioned K.D. as to what if anything had happened between her and respondent. Over a defense objection, K.D.'s mother testified that K.D. then related to her that respondent had had sex with her at his house.

On cross-examination, the mother stated that when she spoke to the police later that night she at first told them that the offense occurred "around April 15." However, based on information given by K.D. and the use of a calendar as they were "going over it," she realized that the incident did not occur on April 15, but, rather, on May 27, 1985. K.D. did not remember an exact date but did remember it being around the time of the Memorial Day weekend which K.D. spent with the family of respondent. K.D. continued to go to the respondent's house every day after Memorial Day until June 20, when she told her mother about the incident. The mother further testified that at the time of the incident, K.D. knew how to tell time but did not know the months of the year very well.

Following the testimony of K.D.'s mother, the trial court continued the case to July 8, 1986, for further testimony. On that date the

State advised the court that the doctor who had examined K.D. was unavailable to testify; and the matter was continued by agreement to August 4, 1986. On August 4, however, the assistant State's Attorney informed the court that she had forgotten about that day's proceedings and had not notified the doctor to appear. After admonishing the State that trial would proceed on the next court date whether or not the doctor appeared, the trial court granted "one last continuance," to August 11, 1986.

On that date, the parties agreed to jointly submit into evidence the emergency room report prepared by Dr. Ganiyw on June 20, 1985, and to stipulate that if called as a witness, Dr. Ganiyw's testimony would be exactly the same as the contents of the report. The report stated that K.D. was brought in for examination of sexual molestation, appearing alert but afraid. His examination disclosed no injuries; and her vital signs and organs were normal. The report stated that no hymen was noted and that there was a small yellowish discharge in the vagina. K.D. stated to Dr. Gainyw that the incident occurred over the holiday a few weeks earlier.

The State then advised the court that it had two more potential witnesses, a police officer and respondent's sister, and asked the court for one more date, on which the State planned to rest its case. On the next scheduled date, August 25, the State advised the court that respondent's sister had not responded to the State's subpoena to appear and rested its case. Defense counsel then moved for a directed verdict on the ground that there was a fatal variance between the petition for delinquency and the evidence adduced at trial which prevented him from presenting an effective defense. Counsel pointed out that the petition for delinquency originally charged that the offense occurred on March 9, 1985; that it was subsequently amended to charge that the incident took place "on or about April 17"; but that the evidence at trial related to the Memorial Day weekend of May 27-28, 1985, for which, in contrast to April 17, respondent had an affirmative defense of an alibi. Defense counsel argued that the variance between the petition and the evidence misled respondent and placed him in the untenable position of defending against evidence relating to two different dates and thereby prevented him from preparing and presenting an effective defense, in violation of respondent's right to due process. The trial court denied the motion for a directed verdict but granted respondent leave to file a memorandum of law in support of his position and stated that it would hear arguments and reconsider the motion at the next court date, which was set for September 29, 1986. On that date, the State requested another continuance, with the acquies-

cence of defense counsel, for the purpose of researching the issues raised in respondent's memorandum of law in support of a directed finding.

On October 27, the trial court heard arguments on respondent's written motion for a directed finding. Defense counsel expounded on his previous arguments concerning the prejudicial effect of the variance between the date charged in the petition and the evidence adduced at trial. Counsel also argued that the trial court had erred in restricting his cross-examination of K.D.'s mother regarding possible bias she might have had against respondent and his family. Following the State's response that there was neither a variance nor any prejudice to respondent, the trial court denied respondent's motion for reconsideration, finding that, based on the nature of the charge, the State is not obligated to allege a specific date in the charging instrument.

Officer Samuel Ray testified for the defense that he spoke with K.D. at her home on June 20, 1985, in the presence of her mother regarding the alleged incident. Although there was some confusion, the date given to him by K.D., which he wrote in the report prepared immediately after the interview, was May 27, 1985. On cross-examination, Ray stated that K.D. vaguely knew times, dates and months and that it was on the basis of what K.D. told them that K.D.'s mother, he and his partner came to the conclusion that the incident occurred on May 27, one of the days of the Memorial Day weekend.

When the trial reconvened the following day, the parties stipulated that, if called, Detective Lerays would testify that he interviewed K.D. in the presence of her mother at the police station on June 21, 1985. The stipulation read that "[h]e ascertained from that interview that *** the alleged assault took place approximately one week before K.D.'s birthday, which is March 15"; but that she was not able to give a specific date at all, and did not seem to know months or dates.

Defense counsel then made an offer of proof regarding his intended cross-examination of K.D.'s mother. Counsel stated that he would have questioned her concerning a letter she wrote to respondent's older brother Derrick, in which she admitted that she lied about having been impregnated by him. Counsel stated that the purpose of this line of questioning was to show that she had lied about respondent's family in the past and to show possible bias against them.

Respondent then took the stand in his own behalf. He testified that he was 15 years old, a sophomore in high school, had been employed for 2½ months and lived at home with his mother, stepfather,

sisters and brothers. He did not recall being at home on Memorial Day weekend in 1985. On occasions in 1985, K.D. came to their home to visit with his sister Charlene. He denied ever having any sexual relations or contact with K.D. or having touched her at any time.

On cross-examination, respondent stated that Charlene's bedroom was on the second floor of the house along with his and his younger brother's bedroom, but that K.D. and Charlene sometimes watched television in his older sister's bedroom on the first floor. There were no ill feelings between him and K.D., although K.D. was disrespectful toward his mother, who nevertheless continued to allow her to visit Charlene and sometimes babysat K.D. K.D. generally was not allowed on the second floor because the bedrooms were there; but there had been at least one occasion when K.D. had been in his bedroom watching television with the other children in the family. He did not recall any time in April or May 1985 that K.D. came up to the second floor looking for Charlene.

Although there was no animosity among the children, and his mother continued to babysit K.D. on occasions, he disagreed with a statement by the prosecutor that "nothing horrid was going on between the two families" prior to K.D.'s allegation against him. On redirect examination, he explained that relations between the two families had been strained since K.D.'s mother had accused his brother Derrick of impregnating her. Derrick spoke to his mother, who in turn spoke to K.D.'s mother, following which the mother sent a letter to Derrick admitting that she had lied. Relations between the families thereafter improved but the relationship between K.D.'s mother and Derrick did not.

Following arguments by counsel, the trial court found respondent delinquent of criminal sexual abuse but not delinquent of criminal sexual assault based on intercourse. The matter was then continued pending return of a social investigation. On December 16, 1986, the trial court heard and denied respondent's motion for a new trial and proceeded to the dispositional hearing. Probation officer Dvorsky advised the court of the results of his social investigation, which, apart from the matter at hand, disclosed a wholly positive social history and steadfast denials by respondent of his guilt in this matter. Dvorsky stated that notwithstanding the seriousness of the charge, on the basis of his investigation, he was not able to make a recommendation for detention, probation or counseling. The court then continued the matter for a clinical evaluation of respondent and sentencing. On February 3, 1987, the trial court placed respondent on probation for one year and sentenced him to serve 10 consecutive weekends in the Juve-

330

nile Detention Center, but granted defense counsel leave to file a motion for reconsideration and modification in five weeks. Respondent's detention period was subsequently modified to five weekends; and this appeal followed.

OPINION

Defendant first contends that the 12-month delay between the filing of the delinquency petition and commencement of his adjudicatory hearing violated his right to due process.

■ The Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 701—1 *et seq.*) provides that an adjudicatory hearing shall be set within 30 days from the filing of a delinquency petition (Ill. Rev. Stat. 1985, ch. 37, par. 704—2). However, the word "shall" in that provision has been held to be directory, rather than jurisdictional or mandatory. (*People ex rel. Davis v. Vazquez* (1982), 92 Ill. 2d 132, 441 N.E.2d 54; *In re Armour* (1974), 59 Ill. 2d 102, 319 N.E.2d 496.) Thus, the mere fact that an adjudicatory hearing is not set or conducted within the 30-day period does not automatically warrant a discharge. *In re Armour* (1974), 59 Ill. 2d 102, 319 N.E.2d 496; *In re A.J.* (1985), 135 Ill. App. 3d 494, 481 N.E.2d 1060.

At the same time, however, it is firmly established that guarantees of due process apply in juvenile proceedings (*In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068; *In re Gault* (1967), 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428; *In re Urbasek* (1967), 38 Ill. 2d 535, 232 N.E.2d 716; *In re C.T.* (1983), 120 Ill. App. 3d 922, 458 N.E.2d 1089); and that the manner in which the delinquency proceeding is conducted must be consistent with those due process guarantees and must comport with the same notions of fundamental fairness as are provided for in adult criminal proceedings (*In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068; *In re A.J.* (1985), 135 Ill. App. 3d 494, 481 N.E.2d 1060).

■ ■ In *People v. Lawson* (1977), 67 Ill. 2d 449, 367 N.E.2d 1244, the supreme court held that a trial court may dismiss a criminal complaint or indictment where delays have actually and substantially prejudiced the defendant in violation of due process requirements. The *Lawson* reasoning was first adopted in the juvenile setting in *In re C.T.* (1983), 120 Ill. App. 3d 922, 458 N.E.2d 1089. The court in that case stated that independent of any statutorily granted power in the Juvenile Court Act, the trial court in a juvenile proceeding has inherent authority to dismiss a delinquency petition for violations of the respondent's due process rights. Under the criteria set forth in *Lawson*, an evaluation of whether delays warrant dismissal of the delin-

quency petition requires, first, that the respondent come forward with a clear showing of actual and substantial prejudice. Upon a showing of such prejudice, the burden shifts to the State to show the reasonableness of the delays. *In re C.T.* (1983), 120 Ill. App. 3d 922, 458 N.E.2d 1089.

If the court ascertains both substantial prejudice and reasonableness of the delay, then the court must make its determination based upon a balancing of the interests of the minor respondent and of the community. Factors the court should consider include, among others, the seriousness of the allegations and the length of the delay. Although no absolute standard of time can be applied, substantial prejudice to the respondent may be presumed by the juvenile court where the delay is sufficiently prolonged. *People v. A.L.* (1988), 169 Ill. App. 3d 581, 523 N.E.2d 970; *In re A.J.* (1985), 135 Ill. App. 3d 494, 481 N.E.2d 1060.

■■ In the instant case, the delinquency petition was filed on June 21, 1985, and charged that the offense occurred on or about March 9, 1985. It is undisputed that respondent requested the first two continuances. The record is clear, however, that none of the continuances from September 4, 1985, to the commencement of the hearing on June 18, 1986, were attributable to respondent. The trial court itself acknowledged the numerous continuances and the prolonged delay and noted that respondent and at least one member of his family were present on every scheduled court date. Indeed, the court apologized to respondent, his family and defense counsel for the hardship caused by the repeated rescheduling. However, neither the court's apologies nor the fact that the court took responsibility for two of the continuances alters the fact that the adjudicatory hearing did not commence until more than nine months after respondent answered ready for trial and approximately one year after the delinquency petition was filed. Thus, we believe this is a case in which substantial prejudice can be presumed, thereby shifting the burden to the State to show that the delay was reasonable.

■■ It does not appear that the continuances were a purposeful attempt to gain a tactical advantage over respondent or otherwise prejudice his case. As noted above, the trial court assumed responsibility for two of the continuances caused by conflicts in its trial schedule. However, the remainder of the continuances were attributable to the State and included two occasions on which K.D. and her mother did not appear in court and two continuances, causing a delay of more than three months, because of the State's failure to obtain K.D.'s emergency room report. In our view, the record before us evinces a

certain degree of laxity by the State in the adjudication of this case which tends to support a conclusion that the delay was neither justified nor reasonable. We also note that the adjudicatory hearing, consisting of the testimony of four witnesses and two stipulations, took place on eight separate dates over a period of more than four months, during which the State requested four more continuances for reasons which ranged from the unavailability of the emergency room physician to the assistant State's Attorney forgetting a continuance date she had requested. The entire adjudication process spanned a period of more than 19 months from the filing of the petition to the conclusion of the dispositional hearing. We conclude that the delay in the adjudication process was unreasonable.

A ruling that the delay was unreasonable, however, is not necessary in this case, since we believe that balancing the interests of all parties involved compels the same resolution. The primary objectives of the Juvenile Court Act are to ensure that the interests of minor respondent, his family and the community are served (Ill. Rev. Stat. 1985, ch. 37, par. 701—2; *In re Armour* (1973), 15 Ill. App. 3d 529, 305 N.E.2d 47, *aff'd* (1974), 59 Ill. 2d 102, 319 N.E.2d 496; *People v. A.L.* (1988), 169 Ill. App. 3d 581, 523 N.E.2d 970; *In re A.J.* (1985), 135 Ill. App. 3d 494, 481 N.E.2d 1060) and to do so in as expeditious a manner as possible (*In re Armour* (1973), 15 Ill. App. 3d 529, 305 N.E.2d 47). The intent of the legislature to eliminate lengthy delays in juvenile proceedings is clearly expressed in recent amendments to the Juvenile Court Act. Section 5—14 of the Act now provides that an adjudicatory hearing must be held within 120 days of a demand for such hearing. The failure to conduct the post-demand hearing within 120 days shall, upon the minor's motion, result in a dismissal with prejudice, unless the court finds that the State unsuccessfully exercised due diligence to obtain material evidence, in which situation the court may continue the hearing for not more than 30 additional days to allow the State to obtain such evidence. (Ill. Rev. Stat. 1987, ch. 37, par. 805—14(1)(A).) Although the current provision was not in effect when the petition in this case was filed, a similar provision went into effect on July 1, 1985, but was amended the following day to become effective April 1, 1986.

The overriding concern of the Juvenile Court Act is the welfare of the minor. (*In re Armour* (1973), 15 Ill. App. 3d 529, 305 N.E.2d 47, *aff'd* (1974), 59 Ill. 2d 102, 319 N.E.2d 496.) To that end, the Act is intended to be remedial, not punitive (*In re Armour* (1974), 59 Ill. 2d 102, 319 N.E.2d 496; *In re A.J.* (1985), 135 Ill. App. 3d 494, 481 N.E.2d 1060); and it specifically provides for promptness in juve-

nile proceedings, the administration of its provisions in a spirit of humane concern (Ill. Rev. Stat. 1985, ch. 37, par. 701—2(2)) and in a manner consistent with principles of fundamental fairness (*People v. A.L.* (1988), 169 Ill. App. 3d 581, 523 N.E.2d 970).

■ In our view the effect of the delay in this case was clearly punitive to respondent. He was compelled to repeatedly absent himself from school and family responsibilities to appear in court on every scheduled court date, and was subjected to an unnecessarily prolonged period of uncertainty and anxiety as to his fate while, according to the social investigation report, attempting to lead a socially constructive life. Indeed, according to respondent's parents, respondent transferred from a private to a public high school during the course of these proceedings, in part because of the effect of the proceedings on his previously average to above-average academic grades. As the court stated in *In re Armour* (1973), 15 Ill. App. 3d 529, 536, 305 N.E.2d 47, "[t]he threat of the loss of liberty should not indefinitely hang over a minor's head." From the facts before us, including the social investigation report which revealed that throughout these proceedings respondent continued to attend school, assisted his parents with household responsibilities, performed odd jobs in the neighborhood, obtained part-time employment, observed a curfew, and refrained from any type of aberrant conduct, it is difficult to understand how the delay in the case could have promoted his welfare. Indeed, the juvenile probation officer assigned to respondent's case repeatedly declined to recommend a period of either detention or probation following the adjudication of delinquency, expressing his opinion that in light of respondent's wholly positive social report, neither disposition would serve a productive purpose.

Additionally, we believe that the delay in the adjudication of this case disserved the interests of respondent's family, the complainant and society as a whole. The repeated continuances and prolonged delay worked a hardship upon respondent's parents, at least one of whom accompanied him to court on each occasion, and caused disruptions in their family life and in respondent's father's work attendance. We also fail to see how the interests of the complainant were served by the prolonged process and repeatedly continued court dates, most of which were during the school year. A victim's interests are best served when the accused is promptly brought under the authority of the juvenile legal system. Similarly, it is in society's best interest that juveniles who have been proved to have committed criminal acts are promptly adjudicated delinquent and provided with guidance and rehabilitative services which are designed to deter and to protect the com-

munity from future criminal conduct by the minor. See, *e.g.*, *In re A.J.* (1985), 135 Ill. App. 3d 494, 481 N.E.2d 1060.

We are mindful of the seriousness of the offense of which respondent was found delinquent. However, it appears that the very nature of the offense and the residential proximity of the complainant and the respondent would be factors providing additional incentive for an expeditious disposition of the delinquency petition. Upon the facts before us and with consideration given to the interests of all involved, we conclude that the delay in this case constituted a fundamental deprivation of respondent's due process rights which warranted granting of his motion for dismissal of the petition against him with prejudice.

Having determined that respondent's motion to dismiss this case prior to the adjudicatory hearing should have been granted on constitutional grounds, we need not address respondent's contentions regarding the sufficiency of the evidence or the court's restriction of his cross-examination of K.D.'s mother. For the reasons stated, the adjudication of delinquency is vacated.

Vacated.

JIGANTI, P.J., and LINN, J., concur.