THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
STEPHEN HOLCOMB, Defendant-Appellant.

First District (1st Division)   No. 1—87—2923

Opinion filed December 11, 1989.

Robert A. Willis, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Loretta H. Davenport, Assistant State's Attorney, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, Stephen Holcomb (defendant) was found guilty of aggravated criminal sexual assault and armed robbery and sentenced to concurrent terms of 30 years' imprisonment. Defendant appeals his conviction and sentence, contending that (1) the trial court erred in denying his motion to dismiss the indictment for violation of his speedy trial rights; (2) the trial court erred in admitting testimony regarding a subsequent offense committed by defendant; (3) the trial court erred in denying his motion to suppress his statement; (4) the trial court erred in denying his motion to suppress identification evidence; (5) the State failed to prove him guilty of the offenses beyond a reasonable doubt; and (6) his sentence is excessive. We affirm.

Following his arrest on November 6, 1985, for an incident not the subject of the charges here, defendant, who was 14 years old at the time, was held in juvenile detention at the "Audy Home." On November 18, 1985, in connection with the offenses charged in the case at bar, the State filed petitions for adjudication of wardship and to have defendant tried as an adult. The hearing on the petitions, scheduled for December 4, 1985, was continued upon defendant's request to December 18, 1985, and again continued "by agreement" of the parties to January 15, 1986.

A finding of probable cause on the petition for wardship was entered on January 15, 1986, and the State's petition to have defendant tried as an adult was granted on January 17, 1986. On February 19, 1986, defendant was indicted by a grand jury for the instant offenses, and the State and defendant were thereafter granted numerous continuances either on their own motions or "by agreement." On June 30, 1987, defendant filed a motion to dismiss the indictment on grounds that his speedy trial rights had been violated. The trial court denied defendant's motion for discharge and his subsequent motion to reconsider.

Prior to commencement of trial on July 8, 1987, the trial court denied defendant's motion to exclude evidence of a subsequent offense. Defendant also moved to suppress a pretrial statement and pretrial lineup identification, and the trial court conducted a combined pretrial hearing on these motions, during which the following evidence was presented.

Chicago police officer Edward Hansen testified that at approxi-

mately 3:45 p.m. on November 6, 1985, while off duty at his home on North Marmora in Chicago, Illinois, he had occasion to arrest defendant following an incident involving victim Lynnea Hill. During the apprehension of defendant, Hansen "tackled" defendant when he continued to run despite Hansen's statements as to his police status. Hansen also struck defendant once in the mouth when defendant kicked Hansen's gun out of his hand and moved towards the gun.

Following defendant's transportation to the 25th district police station by other officers, Hansen had occasion to speak with defendant in an interview room, where he first advised him of his *Miranda* rights and then questioned him regarding the Lynnea Hill incident. During the conversation, defendant was handcuffed to the wall. At the conclusion of their conversation, Hansen escorted defendant to the second floor for further investigation by Detectives Raymond Krull and Robert Collins and youth officer Gregory Bernacki. Hansen denied, either during or subsequent to their conversation, threatening or striking defendant or refusing any requests by defendant to speak with family members.

Collins, Krull and Bernacki, all of whom first observed defendant in the early evening at the second-floor police interview room when he was escorted there by Hansen, testified to their contact with defendant on November 6. They denied threatening or striking defendant on that day, and they did not observe Hansen strike or threaten defendant. Krull testified that defendant mentioned that he was struck by Hansen on the street, that defendant stated he wished to make a statement, and that defendant never told them he did not want to make a statement. He further stated that defendant's Aunt Patricia was contacted prior to the conversation with defendant, and she arrived after their conversation with him prior to 8 p.m. Bernacki testified that defendant never told him that Hansen beat him when he was downstairs or stated that he would not talk without the presence of a lawyer or family member. Collins testified that defendant gave an oral statement after he was advised who they were, advised of his *Miranda* rights, and advised that he could be tried as an adult even though he was only 14 years of age.

After the police became aware that evening that defendant might be a suspect involving a crime pattern of sexual assaults in the "Area 5" district, Krull testified that he drove to the home of Lillian Gonzalez, the victim of the assault in the case at bar, and informed her that they had a suspect in custody. He denied showing any photographs to her. He stated that he stopped four teenage black youths on the street and asked them to volunteer to participate in the lineup. Col-

lins testified that at 8 p.m. on November 6, defendant was placed in a lineup with these four other individuals, all black males, with ages of 16, 18, 19 and 21 and heights ranging from 5 feet 6 inches to 5 feet 9 inches. Gonzalez had previously given Collins a description of her attacker as a black male, 15 to 18, skinny, bumps on the face, high forehead, and short-cropped hair.

Gonzalez testified that she waited in a room at the police station with other victims of sexual assaults before she was brought to a room to view the lineup. She immediately identified defendant as the attacker. Collins, Krull, and Gonzalez all testified that no one told Gonzalez who the suspect was or where he was standing.

Collins also testified that he noticed a cut on defendant's lip, which was not bleeding, and he was aware that defendant was later that night taken to St. Anne's Hospital in Chicago for treatment for his mouth and then taken to the Audy Home.

Collins, Krull and Assistant State's Attorney Patrick McNerney testified to their contact with defendant on November 7, 1985. Krull stated that he and Collins went to the Audy Home on November 7 after they were informed that court documents indicated defendant was 15 years of age and therefore defendant would become an automatic transfer to the criminal division. After defendant also stated that he was 15 years of age, they notified the State's Attorney's felony review unit.

McNerney testified that when he arrived at the Audy Home on November 7, 1985, he introduced himself and his position to defendant and advised him of his *Miranda* rights. Upon his inquiries, defendant responded that the police had treated him well and that no threats or promises had been made to him. After his conversation with defendant, he left the room, memorialized their conversation to paper, returned and read the statement with defendant. Defendant made two corrections, which were initialed by defendant and himself. He, Krull, Collins, and defendant signed the statement. These events lasted approximately 30 to 40 minutes, at most.

Krull and Collins testified that at no time on November 7 did anyone threaten or strike defendant or tell him he could go home upon signing the statement. Krull stated that defendant never expressed that he did not wish to speak with them and that defendant never requested an attorney. Krull related that although it was Chicago police department policy to have a youth officer present when interrogating a juvenile, no youth officer was present because none was available.

Defendant presented no evidence at the hearing on these motions, and the trial court denied the motions.

The following evidence was adduced at defendant's jury trial: Fourteen-year-old Lillian Gonzalez testified that in the afternoon of October 30, 1985, after she left a grocery store located at Grand and Austin carrying groceries, she walked along Grand until she reached a parking lot. As she walked across the parking lot and into an alley, she turned around and saw a "male black, 120 pounds, five-four, 15 to 18," whom she identified as defendant. As she continued walking, defendant grabbed her by the hair and pushed her against the garage. He put a knife to her throat, touched her breast, and threatened to put the knife in if she screamed.

Gonzalez managed to run to the other side of the alley after struggling with defendant. Defendant caught her by the hair, they struggled, and she grabbed the knife and threw it. Defendant then bit her on her left wrist. He next threw her on the ground between two garages, grabbed her by the throat, and banged her head repeatedly against the garage. Defendant proceeded to put her in a position where she was on her back and tried to pull her pants down. At that point she lost consciousness. When Gonzalez awoke, defendant's penis was in her vagina. Defendant remained on top of her a little while and spoke to her. He took four rings and two necklaces from her before he left.

Gonzalez ran home and immediately related the incident to her sister, who telephoned police. Gonzalez was admitted to Northwestern Hospital, where she remained for four days for treatment of cuts and a concussion. At the hospital, Gonzalez described her attacker to police as a male black, five-four, 120 pounds, very short hair, bumps on his face and wearing a brown jacket and black pants.

On November 6, 1985, Gonzalez waited at the police station in a room with other girls until she was taken to another room to view a lineup. She immediately identified defendant in the lineup.

Fifteen-year-old Lynnea Hill testified over defense objection to an incident which occurred on November 6, 1985, at approximately 3:30 p.m. when she left the grocery store at Austin and Grand. As she began walking home, she noticed defendant walking behind her. After she turned around three times to look at defendant, she started to walk faster and then jog. Defendant grabbed her right arm from the side, called her "a bitch," threw her on the grass and stomped on her head twice with his feet. Hill escaped from defendant and ran to her house, located two or three houses from where defendant had attacked her. Her mother came to the door and then chased defendant. Her neighbor, Officer Hansen, exited his home and ran in the direction of her mother and defendant. He returned 15 minutes later with

defendant. On cross-examination, Hill stated that her attacker had little bumps on his face and was not carrying a weapon.

Hansen and Krull testified consistent with their testimony at the motion to suppress hearing, both denying that defendant was abused or threatened after his arrest.

Officer Donald Rehling testified that he transported defendant to the Audy Home shortly after midnight on November 7, 1985. They stopped at St. Anne's Hospital for treatment after defendant complained of a sore lip, where they remained for one-half hour.

McNerney testified to the circumstances surrounding defendant's statement on November 7, 1985, consistent with his testimony at the motion to suppress hearing. He then read to the jury defendant's statement, which indicated that defendant observed Gonzalez enter the store at Grand and Austin as he was riding the Austin Street bus. He exited the bus and waited for her to leave the store. When she exited the store, he followed her into the alley, ran up behind her, and pulled her into the garage. When she began to fight back, he "punched her in the nose." He then pulled her between the garages in the alley, where she fought with him again and she began to lose more blood. He then told her "to drop them." She took her pants down, and he "made her lay down." He thereafter got on top of her and "gave it to her in her vagina half way." She then gave him her chains and rings and he left.

Defendant testified on his own behalf. He stated that he was not in the vicinity of the crime on October 30, 1985, and he denied attacking Gonzalez or Hill. He stated on cross-examination that when Officer Hansen arrested him on November 6, Hansen hit him once in the mouth. He did not fight with Hansen or kick the gun out of his hand. Hansen also threatened him and struck him in the mouth five times as he had the gun pointed at his face while they were in the first-floor police interview room.

The officers did not grant his request to call family members. During Krull's and Collins' two-hour interrogation at the second-floor police interview room, Collins refused his request to make a telephone call and threatened him. Defendant also told other officers that Hansen struck him.

After arriving at the Audy Home during the early morning hours of November 7, 1985, defendant was given something to eat, but was not allowed to call family members. When the officers and assistant State's Attorney arrived at the Audy Home in the evening of November 7, 1985, one of the officers threatened him. When asked by McNerney, defendant denied having any knowledge of the Gonzalez

case, and Collins told McNerney to write a statement. The statement he signed was not true, and he signed the statement because he was afraid he would be beaten again.

On appeal, we first address defendant's contention that the trial court erred in refusing to dismiss the indictment on "speedy trial" grounds. In his appellate brief, defendant raises two arguments in this regard: first, that the trial court violated Illinois statutory provisions; and, second, that his due process rights were violated.

Defendant apparently conceded the statutory issue at oral argument. The relevant provision, section 103—5 of the Code of Criminal Procedure of 1963 (the Code), provides that "[e]very person in custody *** for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant." (Ill. Rev. Stat. 1985, ch. 38, par. 103—5.) In the case at bar, while the 120-day period elapsed if the period is calculated from the time of defendant's arrest to his trial, the 120-day period did not expire if it is calculated from the time of defendant's transfer to the criminal division to be tried as an adult to the commencement of his trial. The question of which time frame would be appropriate to the statutory calculation was answered by our supreme court in *People v. Woodruff* (1981), 88 Ill. 2d 10, 20, 430 N.E.2d 1120, 1122-23, when it interpreted section 103—5's 120-day time period as not attaching until the order authorizing the minor to be prosecuted as an adult.

■ Defendant argues in his brief that the Illinois legislature's amendment of the Juvenile Court Act to provide a 120-day speedy trial provision for juveniles held in custody (Pub. Act 83—1517; 9 Ill. Leg. Serv. 69, 76; Ill. Rev. Stat. 1985, ch. 37, par. 704—2(1)) nullified the supreme court's decision in *Woodruff* ostensibly because it evidences an intention to alter the Code's 120-day attachment term. Apparently, defendant was not aware when he raised this argument that, while the original amendment was to be effective before defendant's arrest, the effective date was extended to take effect after defendant's arrest on April 1, 1986 (Pub. Act 84—12 (amending Public Act 83—1517); Ill. Rev. Stat. 1985, ch. 37, par. 704—2). The legislative history of Public Act 84—12 indicates that the purpose of the postponement was to afford the State's Attorney's office and the circuit court of Cook County additional time to implement an effective program to comply with the Juvenile Court Act amendments. (See 84th Ill. Gen. Assem., House Proceedings, June 30, 1985, at 121 (statements of Representative Cullerton); 84th Ill. Gen. Assem., Senate Proceedings, June 25, 1985, at 280 (statements of Senator Lemke).) Thus, we need

not determine the effect of the amendment on the Code's 120-day speedy trial provision, as any change was not intended to be applicable to a juvenile's arrest before April 1, 1986. *Woodruff,* therefore, mandates a finding that the Code's provisions were not violated in the instant case.

As to defendant's constitutional claim, defendant does not rely on his sixth amendment right to a speedy trial, which attaches at the time of arrest or indictment, and the stringent balancing test applicable to establishing such a violation. (See *Barker v. Wingo* (1972), 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182; *United States v. Marion* (1971), 404 U.S. 307, 30 L. Ed. 2d 468, 92 S. Ct. 455.) Rather, defendant claims that he was denied his due process rights under the fourteenth amendment when he was held in custody for approximately 20 months from his arrest to his trial, he was held "incommunicado" for 12 days before appearing before a judicial officer, and he was never given a detention hearing or an adjudicatory hearing as required under the Juvenile Court Act. To clarify defendant's factual assertions, we note that only 160 days of the almost 20-month delay here are attributed to the State, with 13 continuances attributed to defendant either through "by-agreement" or "motion-defendant" continuances. In addition, although defendant claims to have been "incommunicado" for 12 days, he appeared before a juvenile court the day after he was taken into custody, at which time he was arraigned on other charges and appointed a public defender.

▪ Before addressing defendant's due process claim, it is necessary that we set forth certain established principles. A failure to give a juvenile a detention hearing or adjudicatory hearing within the statutorily prescribed time does not automatically warrant discharge, nor is the failure a *per se* violation of due process. (See *In re A.J.* (1985), 135 Ill. App. 3d 494, 481 N.E.2d 1060; *In re McCall* (1982), 108 Ill. App. 3d 164, 438 N.E.2d 1269.) An adjudicatory hearing is not required where the defendant is transferred to the criminal court to be tried as an adult. (See *People v. Eckmann* (1978), 60 Ill. App. 3d 300, 376 N.E.2d 751.) Finally, although a suspect may challenge his present detention, the mere fact of an illegal arrest or detention does not void a subsequent conviction. See *Gerstein v. Pugh* (1975), 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854 (detaining a defendant pending trial without a determination of probable cause); *People v. Howell* (1975), 60 Ill. 2d 117, 324 N.E.2d 403 (failing to give a defendant a prompt preliminary hearing); *People v. Thompson* (1980), 91 Ill. App. 3d 1111, 415 N.E.2d 648 (failing to promptly bring a defendant before a court for arraignment).

■ Turning now to defendant's due process claim, the United States Supreme Court has held that the due process clause of the fourteenth amendment protects defendants from pre-accusation delays. (*United States v. Lovasco* (1977), 431 U.S. 783, 52 L. Ed. 2d 752, 97 S. Ct. 2044.) The Illinois Supreme Court in *People v. Lawson* (1977), 67 Ill. 2d 449, 367 N.E.2d 1244, has held that a trial court's inherent authority to insure a fair trial permits it to dismiss an indictment where defendant has been denied due process because of actual and substantial prejudice resulting from pre-indictment delay. Although *Lawson* addressed only pre-indictment delay and involved the review of a trial court's dismissal of the indictment before trial, defendant argues that *Lawson* requires a reversal of defendant's convictions here for the delay and circumstances involved from his arrest to his trial.[1] Even assuming *arguendo* that the *Lawson* due process test applies to the circumstances here, we do not believe defendant has established a due process violation under *Lawson*.

A defendant, under *Lawson*, first bears the burden of showing actual and substantial prejudice. The burden then shifts to the State to demonstrate the reasonableness of the delay. Finally, if the defendant and the State has each satisfied its burden in this regard, then the court must balance the interests of the defendant and the public. *Lawson*, 67 Ill. 2d at 459, 367 N.E.2d at 1248.

Defendant essentially relies on his loss of liberty pending trial to show actual and substantial prejudice to him. The prejudice required by *Lawson* and *Lovasco* to establish a fourteenth amendment claim, however, is a showing that a defendant was denied an opportunity of a fair trial, such as an impairment of defendant's ability to prepare a defense. The prejudice in *Lovasco*, for example, was a loss of a significant witness, while that in issue in *Lawson* was defendant's assertions of his inability to remember the events at the time of the alleged violation. Defendant here has not set forth any similar facts from which to find that the delay denied him a fair trial or hampered his ability to receive a fair trial. Thus, as defendant has failed to set forth any facts to demonstrate that he was denied a fair trial, we hold that defendant has not met his burden under *Lawson*.

Defendant next contends that he was denied a fair trial when the trial court allowed highly prejudicial testimony from Lynnea Hill as to

---

[1] In *People v. F.H.* (1989), 190 Ill. App. 3d 321, an appellate court recently applied *Lawson* to vacate a defendant's adjudication of delinquency for a delay occurring between the time of the filing of a juvenile delinquency petition and the commencement of the adjudicatory hearing.

an offense committed by defendant subsequent to the offense for which he was on trial. This testimony, he argues, was not relevant to any issue on trial, but offered merely to prove defendant's propensity to commit the crime.

■ While evidence of other crimes is inadmissible if offered merely to establish a defendant's propensity to commit a crime, the evidence may be admitted if relevant to prove motive, intent, identity, absence of mistake or *modus operandi.* (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238; *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200; *People v. Clark* (1984), 124 Ill. App. 3d 14, 463 N.E.2d 981.) The determination to admit or exclude such testimony is within the trial court's sound discretion. (*People v. Houseton* (1986), 141 Ill. App. 3d 987, 490 N.E.2d 1354.) We hold that the trial court's decision to admit Hill's testimony here was not an abuse of discretion, as this *modus operandi* testimony was relevant to prove defendant's identity as to the offenses on trial.

■ The *modus operandi* exception has been recognized as circumstantial evidence of identity on the basis that crimes committed in a similar manner suggest a common author and strengthen the identification of a defendant. (*Houseton,* 141 Ill. App. 3d at 992, 490 N.E.2d at 1358; *People v. Pavic* (1982), 104 Ill. App. 3d 436, 442, 432 N.E.2d 1074, 1079.) It is especially proper where the defendant's identity is a central issue in the case, as may be shown by a defendant's attempts on cross-examination to discredit a complainant's identification abilities or by defendant's presentment of an alibi defense. (*Houseton,* 141 Ill. App. 3d at 992-93, 490 N.E.2d at 1359; *People v. Walls* (1980), 87 Ill. App. 3d 256, 408 N.E.2d 1056.) To establish *modus operandi* evidence, the State must make a strong and persuasive showing of a similarity in the crime charged and the separate offense which establishes between the two offenses a meaningful link, shown by some distinctive feature not common to most offenses. (*People v. Tate* (1981), 87 Ill. 2d 134, 141, 429 N.E.2d 470, 474.) The State need not, however, demonstrate that the offenses are identical. *Houseton,* 141 Ill. App. 3d 987, 490 N.E.2d 1354.

Defendant here placed in issue his identity by attacking on cross-examination the victim's identification of him and suggesting in opening argument that the lineup identification was tainted by unlawfully suggestive procedures. Additionally, the two offenses had strong similarities and common distinctive characteristics. Both victims were junior high school age girls. Both were followed from behind as they exited the same grocery store at approximately the same time in the afternoon. Both were grabbed from behind, thrown to the ground,

and brutally attacked. The trial court's admission of this testimony, therefore, was not improper.

■ We now consider defendant's assertion that his fifth amendment rights were violated because his pretrial statement was involuntarily given, as it was obtained through the use of duress and coercion. The constitutional privilege against self-incrimination is applicable to juveniles (*In·re Gault* (1967), 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428), and the State bears the burden of demonstrating that a confession was voluntarily made (*People v. Reed* (1984), 123 Ill. App. 3d 52, 462 N.E.2d 512). The trial court need be convinced only by a preponderance of the evidence that the statement in question was voluntary (*Reed*, 123 Ill. App. 3d at 59, 462 N.E.2d at 518; *Lego v. Twomey* (1972), 404 U.S. 477, 489, 30 L. Ed. 2d 618, 627-28, 92 S. Ct. 619, 627), and an appellate court's review of the voluntariness question is limited to whether the trial court's finding is against the manifest weight of the evidence (*People v. Daugherty* (1987), 161 Ill. App. 3d 394, 397, 514 N.E.2d 228, 231; *Reed*, 123 Ill. App. 3d at 59, 462 N.E.2d at 518; *People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606).

To determine whether a confession is voluntarily given, courts have applied the test of whether, under the totality of the circumstances, the confession has been made freely and voluntarily and without compulsion or whether the defendant's will was overborne at the time so as not to be the product of a rational intellect and free will. (*People v. Prude* (1977), 66 Ill. 2d 470, 363 N.E.2d 37; *Prim*, 53 Ill. 2d 62, 289 N.E.2d 601.) When looking at the totality of the circumstances, consideration must be given to "both the characteristics of the accused and the details of the interrogation." *People v. Simmons* (1975), 60 Ill. 2d 173, 179, 326 N.E.2d 383, 386.

■ In the case of juveniles unaided by counsel, trial courts must take great care "to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." (*In re Gault*, 387 U.S. at 55, 18 L. Ed. 2d at 561, 87 S. Ct. at 1458; see also *Haley v. Ohio* (1948), 332 U.S. 596, 599-600, 92 L. Ed. 224, 228-29, 68 S. Ct. 302, 303-04.) The youth of the defendant and the length of his detention must be considered due to the "unequal footing" of a juvenile and an adult. *Gallegos v. Colorado* (1962), 370 U.S. 49, 54, 8 L. Ed. 2d 325, 328, 82 S. Ct. 1209, 1212.

Defendant argues that the State's evidence as to the facts and circumstances which gave rise to the confession here demonstrate the oppressive and coercive police conduct and the involuntariness of

defendant's statement. He directs us to his youth, the length of his detention without consultation of an attorney or meaningful contact with a relative, the absence of a youth officer at the time of his confession, and the fact that defendant had previously been struck by Hansen. These facts and circumstances, defendant argues, are similar to those found oppressive in *Gallegos v. Colorado* (1962), 370 U.S. 49, 8 L. Ed. 2d 325, 82 S. Ct. 1209, and *People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383.

The totality of the circumstances giving rise to the involuntary finding in *Gallegos* consisted of a five-day detention of a 14-year-old boy, during which time the boy's mother unsuccessfully tried to see him and the police refused him any contact with a law or adult advisor. In *Simmons,* the Illinois Supreme Court remanded the case to the trial court to evaluate whether the statement of the 16-year-old, borderline mentally retarded boy was voluntary because the trial court's statement that the defendant "shouldn't be handled any differently than an adult" indicated that the trial court did not use the "special care in scrutinizing the record" as required when evaluating the confession of a juvenile. 60 Ill. 2d at 181.

We find *Gallegos* and *Simmons* to be distinguishable from the case at bar. Unlike *Simmons,* there is no indication here that the trial court did not carefully scrutinize the record in light of defendant's age. Contrary to the circumstances present in *Gallegos,* defendant's guardians were contacted immediately upon his arrest and defendant met with a juvenile officer and his aunt the day he was taken into custody. Defendant was also treated at the hospital and held in juvenile custody at the Audy Home.

■ ■ In considering the totality of the circumstances in light of defendant's age and his approximate 27-hour detention at the time of his statement, we find the trial court's finding that defendant's statement was voluntarily given not to be against the manifest weight of the evidence. In addition to defendant's above-stated outside contacts with adult advisors on the day of his arrest, he was given *Miranda* warnings prior to each interrogation, and he never requested to see an attorney. Furthermore, Hansen explained the circumstances surrounding defendant's injury, other officers testified that defendant's injury was minor, and those officers who had contact with defendant before his confession denied ever threatening or striking defendant. Moreover, defendant made corrections in the statement he signed, initialled the corrections, and indicated at that time that the police had not treated him badly. Finally, although a youth officer was not present when defendant signed the written confession, Krull testified

that he attempted to contact a youth officer but was advised that none was available. Where the police are unable to locate a juvenile officer after making a reasonable effort, they are not precluded from interrogating the juvenile, since the police have a duty to investigate crimes even where juveniles are involved. *People v. Baxtrom* (1980), 81 Ill. App. 3d 653, 402 N.E.2d 327; *People v. Zepeda* (1970), 47 Ill. 2d 23, 265 N.E.2d 647.

Defendant also contends that the trial court erred in denying his motion to suppress identification evidence. He argues that he was denied due process of law by the procedures employed by the police in conducting the pretrial lineup and, therefore, the admission of the victim's pretrial lineup identification and the victim's later in-court identification were improper.

▮▮ Where identification evidence is involved, a court must determine, after considering the totality of the circumstances, whether the confrontation "was so unnecessarily suggestive and conducive to irreparable mistaken identification" that the defendant was denied due process of law. (*Stovall v. Denno* (1967), 388 U.S. 293, 302, 18 L. Ed. 2d 1199, 1206, 87 S. Ct. 1967, 1972; *People v. Hamilton* (1977), 54 Ill. App. 3d 215, 218, 369 N.E.2d 377, 378.) This two-part test involves an examination into, first, the suggestiveness of the identification, and, second, in the wake of a suggestive out-of-court identification, the reliability of the out-of-court identification and later in-court identification. *Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375.

In evaluating the suggestiveness of the lineup identification here, we consider defendant's references to three circumstances which he argues support his contention that the lineup was unnecessarily suggestive: first, the fact that a detective drove to the victim's home before she viewed the lineup; second, the fact that the victim was placed in a room with other victims believed to have been attacked by defendant; and, finally, the dissimilarities in the physical characteristics between defendant and the other lineup participants.

▮▮ Defendant fails to indicate how the first two circumstances resulted in a suggestive identification. Defendant implies that in driving to the victim's home, Krull must have suggested the defendant's identification, but he presents no factual evidence to support this claim, and it is contrary to Krull's and the victim's testimony that no photographs were shown to the victim and no one described the suspect to the victim. Defendant also has not shown that the victim, who was the first to view the lineup, compared descriptions with the other victims or that the other victims otherwise suggested defendant's

identification to the victim.

As to his final claim concerning the suggestiveness of the lineup, defendant asserts that the physical appearance of defendant and the victim's description of the offender were dissimilar from the other four lineup participants. It is established that participants in a lineup need not be physically identical to meet constitutional standards. *People v. Brewer* (1983), 118 Ill. App. 3d 189, 454 N.E.2d 1023.

■■ In the case at bar, the victim described the offender to one police officer as a black male, approximately 18 years of age, 120 pounds, with a high forehead and very short hair, and similarly described the offender to another officer as a black male, 15 to 18, skinny, with bumps on his face, a high forehead and short-cropped hair. The 14-year-old black defendant was described at trial as being approximately five feet five inches in height with very short hair. The other four black male participants were ages 16, 18, 19 and 21 years old, with heights ranging from five feet six inches to five feet nine inches, and each had short-cropped hair, although none of the participants had hair as short as defendant's. We do not believe the above differences in physical characteristics are unnecessarily suggestive.

The cases cited by defendant which have found identifications to be unnecessarily suggestive do not dictate a different result. In *People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152, the defendant was first presented to the victim alone in a "showup" and later presented with another suspect. The 18-year-old defendant in *People v. Morris* (1970), 131 Ill. 2d 443, 266 N.E.2d 44, was placed in a lineup with two adults who were described as physically dissimilar to him.

■■ Moreover, assuming the lineup was unnecessarily suggestive for purposes of applying the second part of the constitutional analysis, we believe that the record would support a finding that the suggestiveness of the lineup did not affect the reliability of either the victim's out-of-court lineup identification or her later in-court identification. The constitutional standard utilized for testing the reliability of an in-court identification is whether the out-of-court identification was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification, while the standard utilized for testing the reliability of the out-of-court identification is similar except that the misidentification need not be "irreparable." (*Neil,* 409 U.S. at 198, 34 L. Ed. 2d at 410, 93 S. Ct. at 381.) In evaluating the out-of-court and in-court identification under these standards, a trial court must consider the totality of the circumstances and is guided by the following factors: the opportunity of the witness to view the criminal act, the witness' degree of attention, the accuracy of the prior de-

scription of the offender, the level of certainty demonstrated by the witness at the confrontation, and the time between the crime and the confrontation. *Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253.

Defendant maintains that the victim had little opportunity to observe the offender during the struggle and that the victim's description of her offender in no way related to defendant. Contrary to these assertions, the record demonstrates that the victim had ample opportunity to observe the offender, that her description of the offender was comparable to defendant's physical characteristics, and that the victim evidenced a high level of certainty in her identification of defendant at the lineup. The victim observed the offender in the afternoon hours when the offender was following her, during her struggle with the offender, and when he engaged her in conversation during the sexual act. In addition, similar to the victim's description of her attacker, defendant was a teenage black male, thin, with short hair and a high forehead. Finally, the victim immediately identified defendant in the lineup conducted within a week of the attack, and no evidence was presented that she ever wavered in her identification. Considering the totality of the circumstances under the guidance of the above-mentioned factors, we find that the record supports a finding that any suggestive procedures in the lineup did not give rise to a substantial likelihood of misidentification or irreparable misidentification.

Defendant next contends that the State's identification evidence was insufficient to prove him guilty beyond a reasonable doubt. It is established that the clear and convincing testimony of a complaining witness alone is sufficient to prove a defendant guilty beyond a reasonable doubt of a sexual offense. (*People v. Secret* (1978), 72 Ill. 2d 371, 381 N.E.2d 285.) In the case at bar, not only did the State present clear and convincing testimony from a complaining witness, but corroborating evidence as well.

As stated previously, the victim had ample opportunity to observe the offender during the course of the attack. Her description to police of the offender shortly after the attack was similar to defendant's description, and she made a positive identification of defendant from a lineup conducted only six days after the attack. Furthermore, the State also introduced corroborating evidence of defendant's signed confession and *modus operandi* testimony from a witness, who had ample opportunity to observe defendant, that defendant also brutally attacked her after he followed her from the same grocery store six days later. We find this evidence amply demonstrates that defend-

ant was proven guilty beyond a reasonable doubt.

Finally, we consider defendant's contention that his 30-year sentence is excessive. We are mindful that a sentence imposed by a trial court should not be reversed by a reviewing court absent a clear abuse of the trial court's discretion. (*People v. Cox* (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541, 545; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 883.) Defendant argues that, in imposing his sentence, the trial court totally disregarded his rehabilitative capacity in violation of the Illinois Constitution.

■■ The Illinois Constitution requires that penalties shall be determined according to the seriousness of the offense and "with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, §11.) Although rehabilitation is a factor which must be considered in determining a proper sentence, it is not the only factor and does not outweigh other considerations which are persuasive of a severe sentence. (*People v. Rogers* (1986), 141 Ill. App. 3d 374, 382, 490 N.E.2d 133, 139; *People v. Watson* (1982), 107 Ill. App. 3d 691, 697, 438 N.E.2d 453, 458.) Other factors to be considered are the nature of the crime and degree of harm to the victim. *People v. Plantinga* (1985), 132 Ill. App. 3d 512, 477 N.E.2d 1299.

■■ At sentencing, the trial court noted the vicious and repeated attack on the victim. The record provides no indication that the trial court did not consider the defendant's rehabilitative potential. The trial court heard evidence in aggravation and mitigation before sentencing defendant. The State presented ample evidence to show that defendant's rehabilitative potential was poor, including testimony from an Oak Park police officer concerning a 1984 sexual assault on a six-year-old boy, a citation to a 1984 juvenile court adjudication for that assault, and a citation to another adjudication in 1985 for the offense of forcible sexual intercourse. The court was also aware of Lynnea Hill's trial testimony as to defendant's attack on November 6, 1985. In light of the brutal nature of the crime, defendant's prior criminal background, and no indication that the court failed to consider defendant's rehabilitative potential, we find that the trial court did not abuse its discretion in imposing a 30-year sentence here.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.