(No. 42480.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. IKE STEPTORE, Appellant.

*Opinion filed March 30, 1972.*

RYAN, J., dissenting.

GERALD W. GETTY, Public Defender, of Chicago (MARY CAHILL, JAMES J. DOHERTY and JAMES B. HADDAD, Assistant Public Defenders, of counsel) for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ROBERT A. NOVELLE and MICHAEL L. GOLDSTEIN, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendant, Ike Steptore, was found guilty by a jury in the circuit court of Cook County of the offense of robbery and sentenced to a term of 15 to 20 years in the penitentiary.

Defendant was indicted along with four other persons for the offenses of murder and robbery, but his motion for a severance was granted and he was tried separately. He

was found not guilty of the murder charge. At the time of trial, defendant was 16 years old and had no prior criminal record.

On July 10, 1968, at 10:57 P.M., the Chicago Fire Department received a report of a fire at 1411 South Keeler. In the bedroom of the dwelling at that address, the firemen found the remains of the occupant, Marie Smrz. The witnesses who investigated the fire for the State testified that the fire had been started about 10:45 P.M., an accelerant had been used, and the blaze had been confined to the bedroom. They had found drawers of a dresser in the dining room opened and a jewelry drawer pulled out.

Willie McLaughlin, a friend of defendant, testified that at about 9:30 that evening, defendant, a boy named Walter and he had entered the back door of Mrs. Smrz' house by kicking in the glass and unlocking the door. While the witness and defendant remained in the kitchen, Walter searched the house. McLaughlin admitted he took a clock radio, and the trio left the house. They then met several other boys, including Willie Coleman.

Coleman testified that, after meeting defendant and the others, he and his girl friend, Delores Johnson, left the group and went together to a back yard area, from which they could see the back porch of Mrs. Smrz' house. Both Coleman and Miss Johnson testified that they saw defendant and four other boys on Mrs. Smrz' back porch. One boy kicked in the door, and they entered the house. A few minutes later defendant and one other boy, Robert Dismukes, left the house and went down the stairs leading from the back porch. Defendant was carrying a piece of cake. Another boy, Walter Montgomery, was still on the porch, near the back door. Dismukes called up to Montgomery something about "it ain't worth it." Montgomery then reentered the house, but defendant and Dismukes remained outside. About 15 minutes later they saw Montgomery and the other two boys leave the house.

Coleman then went to Dismukes' home, where he heard the news that Mrs. Smrz' house was on fire. He further testified that defendant was not at Dismukes' home at that time.

A written, question-and-answer, but unsigned statement given by defendant to the Chicago police was admitted into evidence. Defendant said that he had gone into the house with Montgomery, Dismukes and two others, and, while the other four boys searched for money, he took a piece of cake from the refrigerator and left with Dismukes. About 15 minutes later the other boys left, and defendant then noticed the house was burning.

Robert Dismukes and his sister testified on behalf of defendant that defendant was at Dismukes' home from 5:30 P.M. to approximately 10:30 P.M. on the evening in question. Defendant took the stand and testified to the same alibi. In rebuttal to the testimony of Dismukes, an assistant State's Attorney testified that Dismukes had told him defendant and Dismukes were in Mrs. Smrz' house just prior to the fire.

Defendant initially contends that he was denied his right to a speedy trial because of the trial court's denial of his petition for discharge pursuant to section 103—5 of the Code of Criminal Procedure, hereafter referred to as the 120-day rule. (Ill.Rev.Stat. 1967, ch. 38, par. 103—5.) Defendant was taken into custody on July 30, 1968. On November 25, 1968, the court granted the State's motion for an extension of the 120-day term to December 5, 1968. (Ill.Rev.Stat. 1967, ch. 38, par. 103—5(c).) On November 25, defendant filed a written petition for discharge under the 120-day rule, alleging in the petition that "prior to the 6th day of December, 1968, more than 120 days have passed without his having been brought to trial without any delay on his part."

On December 5, defendant, whose case had not at that time been severed from that of his four co-indictees, appeared in court for trial. Although two of the other

defendants were not prepared for trial because of pending motions, both defendant and the People announced ready for trial. At approximately 4:30 P.M., 12 of the venire were called into the jury box and after being sworn were dismissed with instructions to return at 12:30 the following afternoon. The record shows that immediately before the jurors were called and sworn defendant's attorney orally moved to discharge the venire because certain of them had been in the courtroom while defendant's attorney had been engaged in the defense of another defendant, charged with rape, in a case not in any way related to this one. The court, without ruling on any of the motions, continued the matter for further hearing to the next day, December 6.

On December 6, a Friday, the motion to discharge the venire was allowed and the petition for discharge pursuant to the 120-day rule was continued for hearing to Monday, December 9, in order to allow the State time to answer the petition.

Defendant argues that the calling of the 12 members of the venire on December 5 did not serve to toll the 120-day term because in fact there was at that time another trial in progress before the same trial judge, which trial was not completed until December 6. Defendant contends that because no *voir dire* examination was commenced either on December 5 or December 6 the trial did not begin within the extended period.

The record shows that on December 6, 1968, the circuit court entered an order which recites that the case "coming on before the court for a hearing on the Motion to Discharge the Venire heretofore selected *** the court *** doth allow said motion and *** said motion *** is hereby allowed *** and this cause *** is hereby held on call for December 9, 1968." Subsequently the record reflects an order that the case be "continued until December 10, 1968," the People's written answer to the petition for discharge filed on November 25, 1968, an

order continuing the case to December 16, "with sub-poenas," a continuance to December 17, an "amended list of witnesses" filed by the People, defendant's "Motion to Suppress Confession," a continuance to December 19, 1968, a motion for and an order granting a severance, and several other orders not here pertinent. The trial was commenced on March 6, 1969.

We do not reach the question of whether calling and swearing of the jurors, without further proceedings, commenced defendant's trial within the contemplation of the 120-day rule. Although counsel for the parties do not agree as to what the record shows, it is apparent that the venire was discharged on the basis of defendant's motion. The delays thereafter encountered are attributable at least in part to defendant's subsequently filed motions, and the trial court did not err in denying his petition for discharge.

Defendant's next contention involves the testimony of an assistant State's Attorney called by the People in rebuttal. Over defendant's objection, he testified to a conversation with Robert Dismukes, defendant's co-indictee and one of his alibi witnesses. He stated that during preparation for the trial of Walter Montgomery he briefly interviewed defendant and Dismukes in the Cook County jail where they were incarcerated while awaiting trial. He testified that in the conversation Dismukes stated that he and the defendant had been in Mrs. Smrz' house shortly before the fire. He stated, too, that prior to talking to Dismukes and the defendant he had made no effort to contact the lawyer who represented both of them.

Defendant contends that the testimony related a hearsay statement bearing directly on the question of his guilt, that it was taken in violation of *Massiah v. United States (1964), 377 U.S. 201, 12 L.Ed.2d 246, 84 S.Ct. 1199,* and was inadmissible even for purposes of impeachment. The People contend that no violation of *Massiah* is involved for the reason that the statement was used only in rebuttal; that assuming, *arguendo,* that a *Massiah* question

is presented, defendant is without standing to raise it; that the jury was properly instructed that the evidence could be considered only as impeachment and not as proof of defendant's guilt; that no proper objection was made and the admission of the testimony was not error.

Despite the obvious impropriety of interviewing Dismukes without notice to his counsel, we do not decide whether the testimony was erroneously admitted in impeachment for the reason that other error requires the reversal of the judgment and remandment of the cause.

It is contended next that the trial court erred in refusing to give the jury an instruction tendered by defendant regarding withdrawal from a criminal venture. The only evidence relevant to withdrawal was that defendant and Dismukes left Mrs. Smrz' home some 15 minutes before the fire and that Dismukes made a remark to the others allegedly expressing disapproval of the venture. Since this was subsequent to the two entries into the house by defendant, during which a radio and a piece of cake were taken, since there is no question regarding withdrawal with respect to these matters, and since the defendant was found not guilty of the murder, any error that could possibly have resulted from the refusal of the instruction would not be prejudicial.

Defendant contends next that the trial court erred in denying his motion to suppress his unsigned statement and admitting it into evidence. He argues that the record shows a failure to comply with section 3—2 of the Juvenile Court Act (Ill.Rev.Stat. 1967, ch. 37, par. 703—2) which requires that notice be given to a parent or person legally responsible for the minor's care and that he be surrendered to a juvenile officer without unnecessary delay. The People admit that the officers who arrested and questioned defendant did not comply with section 3—2. The record shows beyond question that defendant, prior to making the statement, was admonished in detail with respect to his right to remain silent and to have counsel immediately

available, and that defendant understood the admonition. Under the circumstances failure to comply with section 3–2 did not render the statement inadmissible. *People v. Zepeda (1970), 47 Ill.2d 23.*

Defendant's next contention involves the attempted impeachment of his sister, Daretta Jones, who testified as a character witness in his behalf. Miss Jones, who stated that she was acting as defendant's "guardian," testified that she knew his reputation was good because he had never caused any trouble for her or for anyone in the neighborhood. On cross-examination the assistant State's Attorney inquired about a conversation she had had with him before trial. She said that she recalled the conversation referred to. The following ensued:

"Q. Would you relate the conversation to the ladies and gentlemen of the jury?

A. Well, you asked me to tell Ike to cop out and plead guilty to robbery and you would drop the murder. Then, you offered him ten to fourteen.

Q. And what did you say then?

A. I told you he wasn't guilty. He wasn't going to cop out.

Q. Did you tell me that you knew he took the cake, but you knew he didn't set the fire?

A. No, I never mentioned no cake because I don't know anything about that accident [*sic.*] at all.

Q. You never told me in the presence of the Detective Tate that your brother took the cake, but there is no sense for him getting a murder rap because he didn't do the burning?

A. No, I didn't.

Q. Now, you're sure about that?

A. I am positive."

Defendant's attorney made no objection and on redirect asked additional questions, to which the witness

replied that she had made no statement that defendant would plead guilty. In rebuttal the State called Detective Tate, who testified as follows:

"Q. At that time, what if anything did Mrs. Jones say? What, if anything, did I say to her?

A. At that time Mrs. Jones—

MR. TOOMIN: I'm going to object to anything outside of the presence of the defendant.

MR. BORANEK: This is rebuttal. It should have been objected to when I asked the question of Mrs. Jones. It's a little late to be objecting.

MR. TOOMIN: I can object later.

THE COURT: He may answer.

A. Mrs. Jones was asking you what would the State's Attorney's office recommend to the court if her brother pled guilty.

Q. Did I reply anything at that time?

A. Yes, sir, you did. You said that the State's Attorney's office would recommend fourteen to twenty years.

Q. Did Mrs. Jones say anything at that time?

A. She said that she thought it was a little high for a piece of cake.

Q. And what—what, if anything else, did she say, Detective?

A. And she said she would consider pleading her brother guilty for two to five or less."

Defendant argues that the admission of the impeachment testimony was prejudicial error in that it informed the jury of plea bargaining negotiations and for the further reason that it was impeachment as to collateral matters. In *People v. Pfanschmidt (1914), 262 Ill. 411,* the court, in discussing the distinction between the testimony of two witnesses called to impeach Henry Geisel, an uncle of the defendant, said at pages 462-463: "The rule is that a witness may be impeached by showing that he has made contradictory statements, but he cannot be thus impeach-

ed as to collateral matters. 'Since the reason of the rule excludes witnesses whose testimony would introduce new issues over and above those which already might be entered into, the test of collateralness should naturally be, could the fact for which they are offered in contradiction have been shown in evidence for any purpose independently of this contradiction?' [Citations.] Under these authorities it is clear that the questions asked Geisel as to his feeling, when he saw the horse and buggy tracks the morning after the fire were improper. Such statement, if he made it, was, in effect, his opinion as to the guilt of plaintiff in error. Such an opinion could not have been given in evidence by him for any purpose. Geisel had stated that the relations between the plaintiff in error and his father were amicable. This was material on the question of motive. His alleged statement to Heidbreder could have been shown in evidence by Geisel or anyone else who heard the statement which it is claimed was made by Charles A. Pfanschmidt, the father, hence it was properly admissible as impeaching testimony."

The Supreme Court in *Kersheval v. United States (1927), 274 U.S. 220, 71 L.Ed. 1009, 47 S.Ct. 582,* recognized the devastating effect of evidence of a withdrawn plea of guilty and our Rule 402(f) provides: "If a plea discussion does not result in a plea of guilty, or if a plea of guilty is not accepted or is withdrawn, or if judgment on a plea of guilty is reversed on direct or collateral review, neither the plea discussion nor any resulting agreement, plea, or judgment shall be admissible against the defendant in any criminal proceeding." 43 Ill.2d R. 402.

It is obvious that except for the contradiction and impeachment, the testimony of the witness Jones on cross-examination and the rebuttal testimony of Detective Tate would not have been admissible, and their admission was error so prejudicial as to require reversal.

For the reasons stated the judgment of the circuit

court of Cook County is reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. JUSTICE RYAN, dissenting:

I dissent from the majority opinion for the reasons set forth below.

In laying the foundation for the impeachment of Daretta Jones the prosecutor asked questions which quite obviously called for answers which would contain objectionable material. It is also clear that it was part of the defense counsel's trial strategy to permit this witness to talk about the plea bargaining discussion with the prosecutor. He therefore did not object to the questions because at the same time that the prosecutor was laying the foundation for the impeachment of this witness he was also laying the foundation for defense counsel's redirect examination which was designed to show that the State had a weak case against this defendant and was trying to salvage something by desperately seeking to bargain for a plea of guilty, but that the defendant and this witness steadfastly maintained his innocence. To understand this strategy one had only to consider the cross-examination quoted in the majority opinion with this redirect examination which appears immediately thereafter:

"Question. Mrs. Jones, this conversation [the prosecutor] has been referring to, that occurred in this building?

Answer. Yes, sir.

\* \* \*

Question. You had several conversations with him?

Answer. Yes, sir.

Question. Each time he wanted to make a deal with you, is that right;

Answer. Yes, sir.

Question. He wanted you to tell your brother

to plead guilty to robbery then he would drop the murder case, is that right?

Answer. Yes.

Question. He was going to give him ten to fourteen years?

Answer. Yes, sir.

Question. And did you tell him your brother wasn't about to plead guilty to something he didn't do?

Answer. Yes, sir."

In order to produce the strategic maneuver and to make his point with the jury, counsel did not object and permitted the prosecutor to set the stage for this scene. Now having received the benefit of his strategy (defendant was found not guilty of murder) defendant urges that this cross-examination was error and this court holds that it was error so prejudicial as to require reversal even in the absence of an objection.

Our Rule 615 (50 Ill.2d R. 615(a)) provides that plain errors affecting substantial rights may be noticed on appeal although they were not brought to the attention of the trial court. There was no objection by the defense counsel to this line of questioning except upon rebuttal testimony by Detective Tate and then the objection was not that the testimony concerned plea bargaining but only that the conversation took place outside the presence of the defendant. This question was not therefore preserved for review unless it can be said to be within the "plain error" concept of Rule 615.

I presume the majority opinion is saying that regardless of counsel's failure to object the trial judge should have injected himself into the case and stopped the prosecutor's cross-examination of this witness. An experienced trial judge, as this judge was, is rightfully reluctant to interrupt the development of counsel's trial strategy and should not be expected to do so. The defense counsel did not object to this line of questioning. He permitted it to

continue hoping it would develop to his benefit. For these reasons I cannot concur in the court's opinion reversing the conviction on this basis.