THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JACQUELINE MONTANEZ, Defendant-Appellant.

First District (2nd Division)   No. 1—93—4519

Opinion filed June 30, 1995.

DiVITO, J., dissenting.

Rita A. Fry, Public Defender, of Chicago (Ira Churgin, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

A jury found defendant, Jacqueline Montanez, age 15 at the time of the offenses, guilty of the murders of Hector Reyes and Jimmy Cruz. She was sentenced to natural life in prison. She challenges the voluntariness of her confession and the *voir dire* of prospective jurors.

Defendant moved to suppress her statements as involuntary because (1) she was not first informed of her *Miranda* rights or (2) that she would be tried as an adult; (3) her mental state and ingestion of drugs and alcohol made her incapable of understanding her rights; (4) the statements were procured by material misrepresentation; and (5) the statements were taken before she had access to a youth officer or her parents.

At the suppression hearing, Chicago police detective Ernest Halvorsen testified that on May 13, 1992, at 9 p.m., he and his partner Detective Renaldo Guevara, arrested defendant on the street for the May 12 murders of Hector Reyes and Jimmy Cruz. He knew defendant was a juvenile. She was taken to the Area Five police headquarters and placed in an interview room, where Halvorsen informed her of her *Miranda* rights and that she could "possibly" be charged as an adult. Defendant indicated that she understood these rights.

Detective Halvorsen asked that a police squad car from the 14th District be sent to defendant's home in an attempt to locate her family. Detective Guevara later told him that defendant's mother had been contacted, but said she would get to the police station as soon as she could. Halvorsen was unaware that defendant's mother was at Area Five or had not been allowed to see defendant.

After the arrest, Detective Halvorsen attempted to contact a youth officer. The youth officer on duty in an adjoining station at that time was busy. Halvorsen did not check again to see whether the youth officer later became available. An Area Five youth sergeant informed him that no Area Five youth officer was then available either, but that he would send the first available officer, who was to come on duty at midnight.

Nevertheless, at about 10 p.m., Detective Halvorsen began to question defendant. No youth officer had yet appeared. He again read her the *Miranda* warnings. She responded that she understood each of her rights and would make a statement. He had a 20- to 30-minute conversation with her and then left her alone in the interview room.

Youth officer Robert Pulia and Assistant State's Attorney (ASA) John Dillon arrived a little past midnight. Detective Halvorsen told Pulia the facts of the case. Later, at about 12:30 a.m., Pulia had a private conversation with defendant. He knew detective Halvorsen already had taken a statement from her. He advised her of her *Miranda* rights anyway, informed her that he was a youth officer, he was present to protect her rights, and he would observe how she was being treated. Pulia told her that her mother had been contacted, based upon what he was told. Pulia was present for the next three conversations Detective Halvorsen and ASA Dillon had with defendant, at 1:15 a.m., 5:15 a.m., and 6:15 a.m.

At 1:15 a.m., ASA Dillon told defendant who he was. She said she understood. Dillon advised defendant of her *Miranda* rights and that she would be treated as an adult, which defendant again stated that she understood. She then spoke to Dillon for about 20 to 30 minutes and agreed to make a statement in the presence of a court reporter. She was given food. Alone with Dillon, defendant told him that she had been treated well and had no complaints.

At 5:15 a.m., a court reporter took defendant's statement, upon ASA Dillon's questions, which was transcribed at 6:15 a.m., and reviewed by Dillon and defendant. Dillon had defendant read a couple of sentences out loud, to make sure she could read and understand English; then he read the rest of the statement to her. Defendant made corrections where appropriate and signed the statement. Dillon saw no one in a waiting area in Area Five headquarters. He did not know that anyone was asking to speak with defendant.

According to Detective Halvorsen, Officer Pulia, and ASA Dillon, defendant did not appear to be under the influence of alcohol or other drugs during their conversations with her. They smelled no alcohol or other drugs. Defendant was sober and coherent, and understood and answered all questions asked of her. Defendant did not state that she was high or under the influence of alcohol.

Defendant's mother, Sandra Lorenzi, testified at the suppression hearing. On May 13, 1992, at 10 p.m., she and her husband were at home. Two police detectives came there and first told her that defendant had witnessed a murder and was in protective custody. She asked to see her daughter. The detectives told her that she could not at that time because they had her in custody. One officer told her that he would let her know when she could see her daughter. Before they left, however, the officers informed her that defendant was involved in a murder.

Lorenzi waited for the police to call. They did not. At about 2 a.m. she nevertheless went to the police station, where she was told

to wait in a waiting room. Instead, she went upstairs but a detective sent her back downstairs. She waited about an hour and one-half and then went back upstairs. The detective told her to "get the hell out" of there because the police were talking with her daughter. She went back upstairs every hour or so. She was not permitted to see defendant until about 8:30 a.m., when she and a friend were allowed into a room to see her. Defendant appeared to be "gagging," and her eyes were bulging. She had seen defendant on alcohol and other drugs before, and defendant appeared the same way. It was difficult to understand defendant. She did not appear to recognize her mother. Lorenzi believed defendant was on drugs or alcohol that morning. After about five minutes, Lorenzi was told by police to leave.

Following argument, the court denied defendant's motion to suppress, finding that the police "exercised a good faith effort after the defendant was arrested when they notified the mother of her incarceration" and that the "only real issue is whether or not the mother was allowed access to the daughter at the police station."

A grand jury indicted defendant on June 19, 1992, for first degree murder and related charges.

At trial, evidence was adduced showing that on May 12, 1992, shortly after midnight, a witness heard laughing and giggling coming from an area in Humboldt Park near a park lavatory. Three women were seen there, one of whom was taller than the other two, and two men. The taller woman, later identified as defendant, was seen entering the ladies washroom with one of the men. A noise that sounded like a firecracker was heard, and the taller woman emerged from the washroom alone. The two shorter women were seen walking with the second man. One went behind the man. A flash was seen behind the second man, and he fell to the ground. The two shorter women ran, the taller one kicked the body and ran in the direction of the other two.

Chicago police detective John Dolan, at Humboldt Park during the early morning hours of May 12, 1992, observed the bodies of Jimmy Cruz on the sidewalk and Hector Reyes in the washroom. Next to the body of Cruz he found a .25-caliber automatic shell casing. He also recovered a bullet near Reyes.

On May 11, 1992, at 11 p.m., defendant and two other girls, "Mauri," and "Tuti," all members of the Disciples street gang, were seen in a white car by Yvette Rodriguez. She declined to go with them to do a "hit." At 1 a.m., Rodriguez saw the same three young women again, who told her that they had shot the guys. Defendant said that she shot one in the head and back, pointing to the back of her head.

Later that day, Rodriguez was arrested for possession of a controlled substance; she had been arrested earlier on a drug charge, which was still pending. While at the police station, Rodriguez claimed that she knew about the double murder. She drove around with the police looking for defendant, Mauri and Tuti. The next day she went with the police to a funeral home in an undercover van. She pointed out defendant and Mauri at the funeral, both of whom were arrested.

Detective Halvorsen testified that on May 13, 1992, at about 8 p.m., he was in an unmarked car at a funeral home in the area of Armitage and Kimball. He had the names of Loca D, whom he identified as defendant, and Mauri and Tuti. All three were members of the Maniac Latin Disciples (MLD). The funeral was for a member of the MLD who had been killed a few days earlier. The witness pointed out defendant and Mauri, and both were arrested. Halvorsen testified concerning the taking of the statements from defendant, consistent with his testimony at the hearing on the motion to suppress. Halvorsen identified defendant in court as the person who made the statements. ASA Dillon also testified as he did at the hearing, reading to the jury defendant's signed statement as transcribed by the court reporter. In the statement defendant confessed to shooting Reyes in the lavatory and to giving the gun to Mauri, who then shot Cruz on the sidewalk.

Following the introduction of related evidence, the State rested. The court denied defendant's motion for a directed verdict.

Defendant's mother testified on her behalf as she did at the suppression hearing.

Defendant testified for the defense. Her nickname in the MLD was Loca D, which meant Crazy Disciple. She used marijuana, T-sticks, cocaine, and acid, and was hospitalized for an overdose in 1987. She also drank alcohol. Defendant was with Marilyn Mulero (Mauri) getting high on May 11, 1992, at 5 or 6 p.m., when they met Rodriguez. They joined her in her car and drove around, stopping to buy drugs, and got high at about 7 p.m. Tuti joined them. Defendant took five tabs of acid and began to hallucinate. The next thing she remembered was seeing a gun at Humboldt Park. While they were driving around, they had seen Cruz and Reyes in a car. There was no plan. Cruz asked if they wanted to get high with him, and they followed him to Humboldt Park. Defendant denied going into the washroom with Reyes, contending instead that Rodriguez did so. She opened the door and saw Rodriguez shoot Reyes. Rodriguez pointed the gun at her and told her she had not seen or heard anything. Rodriguez then shot Cruz in the back of the head.

When defendant went to a funeral the next day, she was arrested. She had been drinking alcohol and smoking marijuana. She had also used cocaine and T-sticks, and drunk hard liquor. She remembered being shown her statement, transcribed by the court reporter at the police station, but did not remember signing it. The police made her confess, and her statement was not the truth. She misspelled her own name 11 times because she was high. The police did not beat her up or strike her. She received food, soda, and cigarettes. She confessed because she was scared and tricked by the police. The defense rested.

The jury found defendant guilty of the murders of Cruz and Reyes. She was sentenced to the mandated term of natural life in the custody of the Illinois Department of Corrections. She appeals.

Defendant first asserts that the circuit court erred in denying her motion to suppress her confession where the evidence shows that she was denied access to a concerned adult. She argues that failing to have either a youth officer or a parent present is material to determining the voluntariness of her statement since she was a minor.

The facts in this case make it abundantly clear that defendant had undergone police questioning and confessed prior to seeing either a youth officer or her mother. Later, other police interviews were undertaken even while the mother was at the police station asking to see her 15-year-old daughter, but was kept from her. It is not a sufficient answer to say that since defendant later was tried as an adult, meaningful notice need not have been given and consequential protections need not have been afforded her.

The investigating officer, Detective Halvorsen, testified defendant arrived at Area Five at 9:30 p.m. He asked others to notify her mother between 9:30 and 10 p.m. One youth officer on duty was busy; he made no effort to recontact her. The Area Five youth sergeant told him no one else was then accessible and that the first person available after midnight would be assigned. Nevertheless, Halvorsen began interrogating defendant minutes later, at 10 p.m.

Detective Halvorsen requested the 14th District to send a squad car to defendant's home, which was in that district. He did not pursue his request and did not personally know if it had been followed. At midnight, Halvorsen's partner, Detective Renaldo Guevara, told him that defendant's mother had been "contacted." The police subjected defendant to the same routine questioning as they would have a criminal suspect without special regard for age or parental preconfession counselling. The youth division was contacted, yet no youth officer conferred with her prior to police interrogation. She had already given one statement to Halvorsen before the youth officer saw

her for the first time at 12:30 a.m. Courts must be particularly careful in cases involving juveniles because "the coerciveness of a situation is thereby enhanced." *People v. Cole* (1988), 168 Ill. App. 3d 172, 179, 522 N.E.2d 635, *appeal denied* (1988), 122 Ill. 2d 582, *cert. denied sub nom. Holman v. Illinois* (1989), 489 U.S. 1021, 103 L. Ed. 2d 203, 109 S. Ct. 1143.

The facts in this case demonstrate the danger of cursory application of principles to facts. What "reasonable notice" was given here? Sandra Lorenzi, defendant's mother, testified that the police came to her home at about 10 p.m. They first told Ms. Lorenzi her daughter had witnessed a murder. Later in this conversation, they told her the daughter was involved in a murder. Without contradiction, Ms. Lorenzi testified to the following: she immediately told the police she wanted to go to the station. The police told Ms. Lorenzi not to come and that they would call her when it was time for her to come. The call from police never came. At 2 a.m., when Ms. Lorenzi became desperate, she went to the station on her own. The fact that the police told Ms. Lorenzi not to come and did not threaten her if she did come does not change that fact that the police psychologically and effectively prevented Ms. Lorenzi's visit to her daughter until after all the questioning was completed and the confession was taken.

It takes little mental effort to understand the reluctance of a parent to disregard a police directive, to stay at home until police called her. To say that this evidence clearly establishes that the police made a "good faith" effort after defendant was arrested when they notified defendant's mother of her arrest makes a mockery of the concept of "reasonable notice." "Notice" here must be understood to have some purpose, namely, to allow, where possible, the concerned adult to confer and counsel with the juvenile *before* interrogation and confession. Yes, an attempt was made to contact a youth officer before the statement was taken; but the interrogation went forward anyway, within minutes. And yes, the parent here was "notified," but in the same breath she was told she could not see her child until called. These circumstances demonstrate the intended fulfillment of notice here was simply a tragic charade. See generally *People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33.

As previously mentioned, Ms. Lorenzi testified that by 2 a.m. she was desperate, and although the police had not contacted her as promised, she nevertheless went to the police station, spoke to the desk sergeant, and was again told to wait. Instead, she went to an upstairs area of the station and spoke to a Spanish-speaking detective who had come to her house. He also told her to wait downstairs. She waited in the station for another hour and one-half. Nobody

contacted her. She went upstairs again. The same Spanish-speaking detective told her to "get the hell out" of there because they were talking to defendant. Several times more she unsuccessfully tried to see her daughter. Eventually, at 8:30 a.m., long past any opportunity for counselling, she was allowed a visit.

According to the record, defendant's court reporter statement was taken at 5:15 a.m. She signed it at 6:15 a.m. Ms. Lorenzi was at the station trying unsuccessfully to see her daughter while investigative questioning was proceeding and the statement was taken. The State chose not to call the desk sergeant to testify in contradiction, nor the Spanish-speaking detective to whom she had spoken. No one who was even potentially in a position to contradict Ms. Lorenzi testified for the State in this aspect of the case.

Detective Halvorsen, who was constantly with defendant; youth officer Pulia, who was with defendant most of the time from 12:30 a.m. on; and ASA Dillon, who was with defendant from about 1:15 a.m. on, did testify. They, however, were in no position to contradict Ms. Lorenzi because they claimed they were not "aware" she was present at Area 5 headquarters. The circuit judge correctly found that defendant's mother arrived sometime after the arrest; the judge erroneously found, however, that the officers testified that at no time did she ask to see her daughter. In fact, no officer testified that Ms. Lorenzi did not ask to see her daughter; rather, they claimed that they were not "aware" of her request. On almost identical facts, Justice Charles Freeman, now an Illinois Supreme Court justice, but then writing for a unanimous appellate court, explained in *People v. Brown* (1989), 182 Ill. App. 3d 1046, 1053-54, 538 N.E.2d 909:

> "Brown's mother testified that she arrived at Area 6 late in the evening, around 7 o'clock on December 23. It is a reasonable inference from the testimony of the State's witnesses that they were not aware of her presence at Area 6 until they ended their interrogation of Brown at about 8:30 p.m. However, the fact that the assistant State's Attorney and police officers who were questioning Brown did not know of his mother's presence at Area 6 is insufficient to avoid the obligation to allow a parent to see his or her child where, as here, the parent has indicated an interest by her presence at the police station. Under such circumstances, *the officers who know of the parent's presence have an affirmative duty to inform those actually questioning a juvenile of the parent's presence and request to see her child. And, in order to ensure the true voluntariness of a statement, those actually questioning the juvenile have an affirmative duty to stop the questioning and allow the parent to confer with her child.*" (Emphasis added.)

Clearly, the alleged "notice" given here was vacuous. Defendant's statements were made before she had an opportunity to confer, prior to questioning, with an adult demonstratively interested in her welfare, her mother, who was present at the station for over six hours. Such failure is "material to determining the voluntariness of [a minor] defendant's statement." *People v. Knox* (1989), 186 Ill. App. 3d 808, 815, 542 N.E.2d 910 (*Knox*); *People v. R.B.* (1992), 232 Ill. App. 3d 583, 594, 597 N.E.2d 879.

In *Knox*, defendant's convictions were reversed because the confession should have been suppressed on his motion. There, Knox, also age 15, was arrested at his home at 9:15 p.m. His father was then at home and he was told he could accompany his son to the station, but the father could not because he was caring for his other younger children. Defendant arrived at the station at 9:30 p.m. As in the present case, the arresting officer notified the police youth division of Knox's presence between 9:45 and 10 p.m., but no youth officer appeared. As also asserted in the instant case, Knox was advised of his rights and stated he understood them. Starting about 9:45 p.m., Knox had a 45-minute interview with the police, during which he admitted his involvement in the crime. An assistant State's Attorney was notified. At 1:45 a.m., the assistant State's Attorney again advised Knox of his rights. Knox repeated his confession. His statement was reduced to writing and was read and signed by Knox at 2:21 a.m., after Knox made and initialed corrections in the statement, read it once to himself and again when it was read aloud to him by the assistant State's Attorney. *Knox*, 186 Ill. App. 3d at 809-13.

Knox's mother testified that she was not home when the police came. When she arrived home at 9:40 p.m., she learned her son had been arrested and went to the station, arriving there at about 10:10 p.m. She identified herself at the desk and was told to wait. At 12 a.m., a detective told her that her son had already confessed, that an assistant State's Attorney would have to be called, and that she might as well go home. *Knox*, 186 Ill. App. 3d at 811.

In *Knox*, both the parents and the youth division were notified of Knox's arrest and presence in the station. The appellate court found the fact that neither was actually present during defendant's confession required suppression, first, because Knox's father's opportunity to accompany his son was an "empty" one due to his responsibility for the other children (*Knox*, 186 Ill. App. 3d at 813) and, second, uncontradicted testimony given by his mother established that "the police contributed significantly to eliminating any opportunity defendant had from speaking to his mother at the police station." (*Knox*, 186 Ill. App. 3d at 813-14.) Considering this evidence, the court stated:

"We do not believe such conduct by police is consistent with the great care required where a juvenile's incriminating statement is received. *At worst, the police purposely precluded defendant's mother from contact with defendant by neglecting to see if defendant's mother had arrived until after such time as defendant had completed his confession.* At best, the police simply subjected defendant to the same routine questioning of a criminal suspect without special regard for his youth. Either scenario is impermissible and casts some doubt over the voluntariness of defendant's statement." (Emphasis added.) (*Knox*, 186 Ill. App. 3d at 814.)

The same conclusion is compelled by consideration of the evidence in the instant case.

Here, the ongoing interrogation was part of a pattern of police attempts to question the minor without prior parental counselling. This pattern of conduct started when the police, already interrogating defendant, told the mother not to come to the station; the pattern continued when the mother, desperate to see her daughter, nevertheless came, only to be obstructed from communicating with her daughter until after statements were made, reduced to writing, and signed.

Juveniles possess the same constitutional privilege against self-incrimination as adults; and when juveniles are unaided by counsel, great care "must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." (*In re Gault* (1967), 387 U.S. 1, 55, 18 L. Ed. 2d 527, 561, 87 S. Ct. 1428, 1458.) Further, special care must be taken in scrutinizing the record where a juvenile is involved, since juveniles could be "easy victim[s] of the law." *Haley v. Ohio* (1948), 332 U.S. 596, 599, 92 L. Ed. 224, 228, 68 S. Ct. 302, 303-04; *People v. Travis* (1984), 122 Ill. App. 3d 671, 674, 462 N.E.2d 654.

In another factual setting similar to the present case, *People v. R.B.* (1992), 232 Ill. App. 3d 583, 592-93, 597 N.E.2d 879, the appellate court held:

"Juvenile confessions are to be carefully reviewed to ensure that they are voluntary and not coerced, suggested, or the product of a juvenile's ignorance of rights, his adolescent fantasy, fright or despair. (*People v. Holcomb* (1989), 192 Ill. App. 3d 158, 548 N.E.2d 613; *People v. Racanelli* (1985), 132 Ill. App. 3d 124, 476 N.E.2d 1179.) The test is whether, under the totality of the circumstances, the statement was made freely, without compulsion or inducement of any sort (*Haynes v. Washington* (1963), 373 U.S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336), with consideration given to the characteristics of the accused and the details of the interrogation. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041.) Considering the totality of the circumstances, *and*

*particularly the absence of a youth officer or parent prior to incrimination, we conclude that the trial court improperly denied defendant's motion to suppress his statement and quash arrest.*

\*\*\*

\*\*\*

This court has stated that the failure to telephone a juvenile defendant's parents, or the absence of a parent during questioning, is a factor in determining voluntariness, but is not determinative of whether defendant's confession should be suppressed. (*People v. Stachelek* (1986), 145 Ill. App. 3d 391, 495 N.E.2d 984; *In re J.S.* (1984), 121 Ill. App. 3d 927, 460 N.E.2d 412.) However, *where the State failed to take appropriate steps to ensure that a juvenile defendant had an opportunity to confer with an interested adult, either a parent or a youth officer, this court has held that the police conduct rendered his confession inadmissible. People v. Knox* (1989), 186 Ill. App. 3d 808, 542 N.E.2d 910." (Emphasis added.)

In *In re J.O.* (1992), 231 Ill. App. 3d 853, 855, 596 N.E.2d 1285, yet another case involving similar facts, the appellate court held:

"A juvenile's age and the fact that the interrogation occurred in the middle of the night may properly be considered in evaluating the voluntary nature of a confession. (*Haley v. Ohio* (1948), 332 U.S. 596, 92 L. Ed. 224, 68 S. Ct. 302.) *Additionally, if parents have indicated an interest by their presence, then they should be allowed to confer with their children before any questioning begins, as well as be present when any questioning occurs. (In re S.D.S.* (1982), 103 Ill. App. 3d 1008, 431 N.E.2d 759.) The presence or absence of a parent is a factor in evaluating the voluntary nature of a confession under the totality of the circumstances test. *In re S.D.S.* (1982), 103 Ill. App. 3d 1008, 431 N.E.2d 759." (Emphasis added.)

In the case *sub judice*, not only was defendant interrogated before having an opportunity to confer with a concerned adult but, worse, any opportunity to do so was effectively frustrated by police. This factor is "material" in determining the voluntariness of defendant's statement. (*Knox*, 186 Ill. App. 3d at 815; *R.B.*, 232 Ill. App. 3d at 594.) In *Knox*, the court concluded:

"Here, however, the failure to have a juvenile officer present is material to determining the voluntariness of defendant's statement. *That failure, in view of the failure to permit defendant's mother an opportunity to see her son at the police station, deprived defendant of his only chance to consult with any adult interested in his welfare prior to making a statement.* Such is not the type of sensitivity to be accorded to receipt of a minor's statement.

We therefore reverse defendant's convictions and remand the matter for a new trial." (Emphasis added.) *Knox*, 186 Ill. App. 3d at 815-16.

The same result is required in the instant case. The dissent mischaracterizes our decision by charging that we apply a *per se* rule instead of a totality of the circumstances test in determining the voluntariness of defendant's confession. Our decision, however, is not based solely on the fact that defendant was interrogated without the opportunity to confer with a concerned adult. Here, a juvenile defendant, age 15, was interrogated throughout the night as part of a pattern of police conduct designed to elicit a confession, as well as to obstruct parental counselling. Under all these circumstances, the confession was not voluntary. That defendant was tried as an adult is after the material fact.

Notwithstanding the strong evidence of defendant's guilt in this case, reversal is mandated on principle and a new trial is ordered for reasons set forth above.

Since this case must be retried, other assignments of alleged trial error need not be considered here.

Reversed and remanded for a new trial.

McCORMICK, J., concurs.

JUSTICE DiVITO, dissenting:

The majority judgment in this case cannot be reconciled with well-established Illinois law. I therefore respectfully dissent.

The majority errs because (1) it ignores the standard that a trial judge's ruling on a motion to suppress a confession should not be reversed unless it is contrary to the manifest weight of the evidence, and (2) it ignores the standard that the voluntariness of a confession is determined by the totality of the circumstances and that not having either a parent or a youth officer present for a juvenile's confession is merely a consideration which does not automatically render that confession inadmissible.

## I. STANDARD OF REVIEW

"The established standard of review of a trial court's finding on a question of the voluntariness of a confession is whether the finding is contrary to the manifest weight of the evidence." (*People v. Melock* (1992), 149 Ill. 2d 423, 448, 599 N.E.2d 941, 951.) Our supreme court has repeatedly stated that "[t]he finding of the trial court on the voluntariness of a confession will not be disturbed unless it can be said

that it is contrary to the manifest weight of the evidence." (*People v. Davis* (1983), 97 Ill. 2d 1, 20, 452 N.E.2d 525, 534.) This standard of review applies to a trial court's ruling concerning the admissibility of a juvenile's confession as well. *In re Lamb* (1975), 61 Ill. 2d 383, 388, 336 N.E.2d 753, 756, *cert. denied* (1976), 425 U.S. 938, 48 L. Ed. 2d 180, 96 S. Ct. 1672.

The majority pays no heed to this standard; indeed, it totally ignores it despite its significant application in both *People v. Brown* (1989), 182 Ill. App. 3d 1046, 538 N.E.2d 909, and *In re J.O.* (1992), 231 Ill. App. 3d 853, 596 N.E.2d 1285, cases upon which it relies and which are discussed below.

The classic explanation of the application of the standard, repeated numerous times by our courts, is provided in *In re Application of County Collector* (1978), 59 Ill. App. 3d 494, 375 N.E.2d 553:

> "In order for a finding to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent." *Application of County Collector*, 59 Ill. App. 3d at 499, 375 N.E.2d at 557.

Application of this standard in this case would have mandated affirmance, for it cannot be said that a conclusion opposite that drawn by the trial judge is clearly apparent. As will be demonstrated below, the trial judge's ruling was correct and the *per se* rule applied by the majority is inconsistent with precedent and unjustified by Illinois law.

## II. TOTALITY OF CIRCUMSTANCES STANDARD

Our supreme court has stated that "this court has long looked to the 'totality of the circumstances' to determine the voluntariness of any confession." (*People v. Prude* (1977), 66 Ill. 2d 470, 475, 363 N.E.2d 371, 373, *cert. denied* (1977), 434 U.S. 930, 54 L. Ed. 2d 291, 98 S. Ct. 418.) It has stated that "[t]he determination of the question whether or not a confession is [voluntarily given] depends not on any one factor, but upon the totality of all the relevant circumstances." (*People v. Johnson* (1970), 44 Ill. 2d 463, 468, 256 N.E.2d 343, 347, *cert. denied* (1970), 400 U.S. 958, 27 L. Ed. 2d 266, 91 S. Ct. 356.) This standard applies to statements of juveniles as well as to those of adults. *Prude*, 66 Ill. 2d at 468, 363 N.E.2d at 373; *In re Lamb*, 61 Ill. 2d at 388, 336 N.E.2d at 756.

Every Illinois court that has addressed the issue (*Knox*, discussed below, being the single exception because it does not address the issue) has applied the totality of the circumstances test and rejected the *per se* rule regarding a minor's opportunity to consult with a parent or other person before being questioned: *In re Stiff* (1975), 32 Ill.

App. 3d 971, 978, 336 N.E.2d 619, 625 (citing supreme court "totality of circumstances" test, explicitly rejected invitation to adopt *per se* rule when parent is not notified and juvenile is not taken to youth officer); *In re Bertrand* (1978), 65 Ill. App. 3d 703, 705, 382 N.E.2d 660, 662 (totality of circumstances test applied to affirm admission of juvenile's admission to two armed robberies before any effort was made to contact juvenile's parents or youth officer); *People v. Baxtrom* (1980), 81 Ill. App. 3d 653, 660-61, 402 N.E.2d 327, 332 (totality of circumstances test applied; even violation of Juvenile Court Act would not render statement inadmissible); *In re S.D.S.* (1982), 103 Ill. App. 3d 1008, 1012, 431 N.E.2d 759, 762, *cert. denied* (1982), 459 U.S. 869, 74 L. Ed. 2d 128, 103 S. Ct. 153 (*per se* rule not to be followed; voluntariness of confession to be gleaned from totality of circumstances); *In re J.S.* (1984), 121 Ill. App. 3d 927, 936-37, 460 N.E.2d 412, 418-19 (totality of circumstances test applied; failure to notify parent and youth officer merely a consideration in determining voluntariness; juvenile's confession properly admitted); *People v. Clements* (1985), 135 Ill. App. 3d 1001, 1007-08, 482 N.E.2d 675, 680, *cert. denied* (1986), 476 U.S. 1106, 90 L. Ed. 2d 361, 106 S. Ct. 1952 (totality of circumstances test applied; failure to notify guardian of juvenile with below average IQ did not render confession inadmissible); *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 402-03, 495 N.E.2d 984, 990-91 (totality of circumstances test applied; failure to notify parents did not render statements of juvenile inadmissible; statute "is not meant to immunize minors from police investigation and interrogation"); *People v. Holcomb* (1989), 192 Ill. App. 3d 158, 171-72, 548 N.E.2d 613, 623-24 (unavailability of youth officer does not prevent police from interviewing juvenile, for police have a duty to investigate crimes even where juveniles are involved).

In *People v. Bobe* (1992), 227 Ill. App. 3d 681, 592 N.E.2d 301, *appeal denied* (1992), 146 Ill. 2d 634, 602 N.E.2d 459, the court held that the statement of a 16-year-old defendant was voluntary, even though the defendant's father and another testified, without contradiction, that his father was not permitted to see him, a juvenile officer was not present during all interviews, and the defendant was handcuffed, unfed, and alone in a room for several hours. *Bobe*, 227 Ill. App. 3d at 705, 592 N.E.2d at 316.

Although some courts have held that the statutory requirement that a parent or a youth officer be notified does not apply when a juvenile is charged as an adult, because the juvenile is not subject to the jurisdiction of the juvenile court but to that of the criminal court (*People v. Sevier* (1992), 230 Ill. App. 3d 1071, 1084, 598 N.E.2d 968, 978; *People v. Green* (1988), 179 Ill. App. 3d 1, 13, 535 N.E.2d 413,

420, *appeal denied* (1989), 127 Ill. 2d 627, 545 N.E.2d 120; *People v. Visnack* (1985), 135 Ill. App. 3d 113, 126, 481 N.E.2d 744, 753), most courts addressing the issue, as indicated in the preceding two paragraphs, hold that failure to comply with the statutory requirement is merely a consideration in determining admissibility of a juvenile's statements in *either* juvenile or adult proceedings. The majority's decision here is not defensible under either line of cases.

In *People v. Zepeda* (1970), 47 Ill. 2d 23, 265 N.E.2d 647, in construing the section of the Juvenile Court Act requiring parental notification and surrender of the minor defendant to a juvenile officer, our supreme court held that the juvenile defendant's statements in that case were properly admitted despite being taken out of the presence of parents and a juvenile officer. The court held that because the statements of the juvenile had been voluntarily given and with due regard for his constitutional rights, "even if it be assumed that there was a failure to reasonably comply with [the relevant statute] and that such failure caused defendant to be unlawfully detained," those facts would not in themselves invalidate a confession. *Zepeda*, 47 Ill. 2d at 27, 265 N.E.2d at 649.

In *People v. Steptore* (1972), 51 Ill. 2d 208, 281 N.E.2d 642, the police concededly did not comply with Juvenile Court Act provisions that required notice to a parent and surrender to a juvenile officer. Nevertheless, our supreme court held that because the juvenile defendant was told of his rights to silence and to have counsel present and he understood them, "[u]nder the circumstances failure to comply with [the relevant statute] did not render the statement inadmissible." *Steptore*, 51 Ill. 2d at 214-15, 281 N.E.2d at 645.

Illinois' rejection of the *per se* rule is understandable. Although a requested attorney must be present for custodial questioning, there is no requirement—constitutional, statutory, or case law—that a parent or youth officer be present for questioning of a minor. The statute in question here[1] requires only the *notification* of a parent or guardian and that the minor be taken to a youth officer. As our supreme

---

[1]The relevant statute reads as follows:

"A law enforcement officer who takes a minor into custody without a warrant *** shall, if the minor is not released, immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been taken into custody and where the minor is being held; and the law enforcement officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for such purposes in the county of venue or shall surrender the minor to a juvenile police officer in the city or village

court said in *Zepeda*, "Nothing in [the statute], or in any other provision of the [Juvenile Court] Act, imposes sanctions for a failure to comply and, under the rule long adhered to by this court, unlawful detention will not, of itself, invalidate a confession or statement of an accused." (*Zepeda*, 47 Ill. 2d at 27, 265 N.E.2d at 649.) It is thus not surprising that the well-established standard in Illinois is that any violation of the statute is merely a consideration in weighing the totality of circumstances.

Interestingly, the majority does not say it is applying a *per se* rule.[2] Instead, quoting *Knox*, it twice says that the alleged refusal to allow defendant's mother to see defendant was "material" in determining the voluntariness of defendant's statement. (273 Ill. App. 3d at 852, 854.) If "material" is code for *per se*, the majority's judgment, though incorrect, is at least logical. If "material" is merely descriptive of the kind of "consideration" the evidence merits, the majority's conclusion cannot be justified.

In reaching its judgment, the majority ignores every case cited in this section. More important, it ignores the well-established principles supplied by those cases. Inexplicably, it also ignores the fact that even defense counsel, while arguing for suppression of the confession before the trial judge, invoked the totality of circumstances test and conceded that the absence of defendant's mother and a youth officer was only a factor to be considered.

## III. DETERMINATION OF VOLUNTARINESS IN THIS CASE

### (a) The Evidence

The evidence is critical in applying the correct standards to a case such as this. For that reason, a summary of the relevant

---

where the offense is alleged to have been committed." 705 ILCS 405/5—6(2) (West 1992).

[2]In response to this dissent, the majority specifically denies applying a *per se* rule. (273 Ill. App. 3d at 855.) For the first time in its analysis, and only in connection with this denial, does the majority concede the existence of the standard of the "totality of the circumstances test in determining the voluntariness of defendant's confession." (273 Ill. App. 3d at 855.) The majority's additional basis for finding the statements involuntary (that defendant "was interrogated throughout the night as part of a pattern of police conduct designed to elicit a confession") (273 Ill. App. 3d at 855) is not supported by the record and is contrary to the trial judge's findings. Indeed, that basis represents nothing more than the *per se* rule bolstered by conclusional statements designed to comply with the totality of circumstances test.

testimony at the suppression hearing and at trial follows. *People v. King* (1986), 109 Ill. 2d 514, 525, 488 N.E.2d 949, 955, *cert. denied* (1986), 479 U.S. 872, 93 L. Ed. 2d 173, 107 S. Ct. 249 (on review, evidence presented at trial may be considered in addition to evidence presented at suppression hearing).

At the suppression hearing, four witnesses testified: Detective Ernest Halvorsen, youth officer Robert Pulia, and Assistant State's Attorney John Dillon for the State; and Sandra Lorenzi, defendant's mother, for defendant.

Detective Halvorsen testified that he contacted the 14th District and requested that a beat car go to the home of defendant's mother to tell her that defendant was at Area 5. Each of the State's witnesses testified that he or she had been informed that defendant's mother had been notified of defendant's arrest. Detective Halvorsen testified that between 9:30 and 10 p.m. he learned that the youth officer from the 25th District was otherwise occupied and that an Area 5 youth officer would not be available until midnight. Defendant was not handcuffed. The State's witnesses testified that defendant was sober and coherent, did not appear under the influence of drugs or alcohol, did not smell of drugs or alcohol, understood questions, and was responsive to them. Each of the three State witnesses, at various times, gave defendant *Miranda* warnings at least once; on each occasion defendant said she understood her rights. She was given cigarettes. She asked for and was given a soda; later she asked for and was given food. She privately told the assistant State's Attorney that "she had been treated well and she had no complaints." The youth officer was present for all of defendant's interrogations except the first. Detective Halvorsen was never told that defendant's mother wanted to see defendant; when they were in the open area of the police station, none of the three State witnesses was aware of anyone desiring to see defendant.

Defendant gave Detectives Halvorsen and Renaldo Guevara an oral statement, which lasted 20 to 30 minutes, starting at about 10 p.m.; she gave the assistant State's Attorney an oral statement, which lasted 20 to 30 minutes, starting at about 1:15 a.m.; she gave the statement to the court reporter, which lasted about 10 minutes, starting at about 5:15 a.m.; and she read, corrected, and signed each page of the transcribed statement, which was 11 pages long, starting at about 6:20 a.m. The assistant State's Attorney had her read the first portion of her statement aloud to satisfy himself that she could read English. Sitting next to her, he then read it aloud as she followed along. During this time she made corrections on the statement, initialled the corrections, and signed each page. This process took ap-

proximately 15 to 20 minutes. A photograph taken of defendant immediately after she signed the statement, showing her "with a big smile," was signed by her and admitted into evidence.

In her statement to the court reporter, defendant was advised of her *Miranda* rights and waived them. She said she had been treated well by the police and the assistant State's Attorney, had not been promised anything, had not been threatened in any way, and had been given food and cigarettes. She said that she was a member of the Maniac Latin Disciples street gang. On the day of the killings, she met with fellow female gang members "Muneca" and "Tuti" to plan "a mission" to get revenge for the killing of "Mudo," a fellow male gang member who had been killed by the Latin Kings, an enemy gang, a couple of days before. She had a .25-caliber automatic. They drove in the car of "Rabbit," the brother of Muneca, to the area of the Latin Kings. They looked for Latin Kings and finally met Jimmy Cruz, whom she knew, and Hector Reyes, whom she had met previously. They were Latin Kings. They were in another car and agreed to meet in Humboldt Park "to catch a buzz." At the park, they left their cars and walked. She walked with Cruz until they arrived at a washroom. Reyes said he needed to use the washroom, and she walked in with him. They kissed in the washroom for a couple of minutes. When Reyes turned his back to use the toilet, she shot him in the back of the head. After leaving the washroom, she gave the gun to Muneca. Tuti, who was walking hand in hand with Cruz, gave Muneca a signal, and Muneca went up to Cruz and shot him in the back of the head. Defendant "[s]howed [her] respect" for Cruz and then drove with her friends to her gang's area. There she told her fellow gang members what they had done and they celebrated with marijuana and beer.

Detective Anthony Riccio testified at trial that at about 9 a.m. he took defendant from the interview room. When she saw television cameras outside the room, defendant said, "What is up with these cameras?" She then said "Disciple thing" and gave the sign of the Maniac Latin Disciples, a pitchfork in an upright position. As she entered an office, she said "Maniac" and then "K.K.," which meant "King Killer." Riccio testified that defendant was sober, alert, and able to understand directions "completely." A videotape showing defendant, her actions, and her words was then played for the jury.

Defendant's mother testified that two plainclothes detectives came to her home at about 10 or 10:15 p.m. One of them was a "Spanish guy." They "pounded" on the door and "came with some guns in their hands." They scared her and her baby and told them to go into another room because "they needed to talk to [her] husband" for

whom they specifically asked by asking him if he was William Burrell. They told him that his daughter called him. When she heard her daughter's name she came out of the other room and said, "no it wasn't like that." The officer said that her daughter had seen a murder and "[t]hat he had her in custody, whatever, protective custody." He gave her the correct address of the place where she was in custody. The officer then told her that defendant "had called the house and that she seen the murder, and it was a lie because she talked to me." The officer then told her that defendant was in custody; she was involved in a murder. At the hearing, she testified the police were there about an hour and left "[a]bout 11, 12"; at trial she testified the police were there "maybe an hour, an hour and a half" and left at "maybe eleven, 11:15."

Defendant's mother then testified that she waited at home because the police had told her not to go to the police station and that they would call her when she could go. Though she received no call, she went to the police station with a girlfriend at about 2 a.m. About 10 minutes after arriving, she went upstairs and was told by the same Spanish officer who had been to her home that she "couldn't go in there." She went downstairs for about $1^1/2$ hours, and at "[a]bout 3:00, 3:15" (she had her watch on so she knew the time), the same officer told her "that I had to get the hell out of there because they were talking to her." She finally saw her daughter at 8:30 a.m. At first her daughter did not know who she was. Her daughter was gagging and she could not understand her. She could understand her speech "[v]ery little, very little." Her daughter's face and eyes "were all pushed out like she would have been high." She believed her daughter had been on drugs or alcohol that morning.

On cross-examination, defendant's mother testified that defendant did not live at home. She was living in a foster home, but she was a runaway from that home at the time. As for the girlfriend who accompanied her to the police station, "[s]he got beat up with the gangs so she left town" and she had not talked to her for about five months. At trial, when shown the photograph taken of her daughter immediately after the statement to the court reporter, she said her daughter looked worse than she did in the picture, "[h]er hair was all messed up and everything." Nevertheless, she testified, "[y]ou can tell she was high there too, but not that much."

### (b) Cases Cited by the Majority

Except for a single aberration, the cases cited by the majority directly support the opposite conclusion or are distinguishable.

In *People v. Brown* (1989), 182 Ill. App. 3d 1046, 538 N.E.2d 909 (273 Ill. App. 3d at 851), for example, the appeal was brought by the State following the granting of a motion to suppress in the circuit court. While the majority correctly quotes from the decision (273 Ill. App. 3d at 851), immediately following the quoted portion the appellate court states that the failure to advise a concerned adult was merely a *consideration* in evaluating the voluntariness of a juvenile's statement or confession. Using the defendant's inability to confer with his mother as a consideration, *combined with* the failure of the police to advise the defendant of his *Miranda* rights, the court concluded that the trial judge's finding that the statement was coerced was not against the manifest weight of the evidence. *Brown*, quoted by the majority solely for its out-of-context language, thus does what the majority fails to do: it utilizes the proper standard of review and applies the totality of circumstances test. Proper application of *Brown* would have supported affirmance of the trial judge's ruling here, for it too was not against the manifest weight of the evidence.

The majority says *People v. R.B.* (1992), 232 Ill. App. 3d 583, 597 N.E.2d 879 (273 Ill. App. 3d at 853-54), presents "another factual setting similar to the present case." (273 Ill. App. 3d at 853.) It neglects to point out, however, that there the appellate court concluded that the defendant had been arrested without probable cause. In considering whether sufficient attenuation existed to purge the defendant's statement from the taint of his illegal seizure, the court concluded that the evidence did not show that the defendant waived his *Miranda* rights. The court's discussion of the failure of the police to contact a parent or a youth officer was connected to the attenuation issue and in the context of a juvenile having been *illegally* arrested. The instant case bears no resemblance to *R.B.*

*In re J.O.* (1992), 231 Ill. App. 3d 853, 596 N.E.2d 1285 (273 Ill. App. 3d at 854), is another case in which the State appealed the circuit court's suppression order. On appeal, the State contended that the circuit court had erred in suppressing the juvenile's confession solely because his parents had been denied the right to see him; the State thus argued that the circuit court had erred by applying a *per se* rule. The appellate court said that "there is no *per se* rule that juveniles must be allowed to consult with their parents prior to questioning." (231 Ill. App. 3d at 854.) The court also stated that "it is well settled that the voluntariness of a juvenile's confession is to be determined by the totality of the circumstances." (*J.O.*, 231 Ill. App. 3d at 854, 596 N.E.2d at 1286-87.) It then evaluated the circuit court's ruling using the totality of the circumstances standard, and concluded that the circuit court had applied a totality of circum-

stances standard and not a *per se* standard and thus affirmed the circuit court's suppression order. Again the majority quotes the appellate court's statement out of context, making it appear to support its position when in fact it does exactly the opposite.

Both *People v. Cole* (1988), 168 Ill. App. 3d 172, 522 N.E.2d 635, *appeal denied* (1988), 122 Ill. 2d 582, 530 N.E.2d 253 (273 Ill. App. 3d at 850), and *People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33, *appeal denied* (1987), 116 Ill. 2d 570, 515 N.E.2d 120 (273 Ill. App. 3d at 850), are contrary to the majority's judgment. In *Cole*, the court suppressed a juvenile's confession because of an illegal arrest and recognized that failure to notify a parent or to have a youth officer present was properly considered, "but that a violation of the statute was not a *per se* denial of a juvenile's constitutional rights." (*Cole*, 168 Ill. App. 3d at 181, 522 N.E.2d at 640.) In *McGhee*, the court, in suppressing the confession of a juvenile because of an illegal arrest, applied the totality of circumstances test and said that denying the juvenile's mother the opportunity to see him and not having a youth officer present "does not *per se* constitute a denial of the defendant's rights." *McGhee*, 154 Ill. App. 3d at 236-37, 507 N.E.2d at 35.

*People v. Knox* (1989), 186 Ill. App. 3d 808, 542 N.E.2d 910, *appeal denied* (1989), 127 Ill. 2d 630, 545 N.E.2d 122, the primary case relied upon by the majority (273 Ill. App. 3d at 852-53, 854-55), is an aberration from the line of cases deciding this issue. In *Knox* a panel of the appellate court reversed the circuit court, without citation to authority regarding its ultimate holding, without considering the manifest weight of the evidence standard of review, and without reference to the principle that the failure to notify a parent or a youth officer is merely one consideration in the evaluation of the voluntariness of a juvenile's statement or confession. Without saying so, the *Knox* court applied a *per se* rule, contrary to every other case addressing this issue. The majority finds this aberrant case persuasive, but it should not be followed.

### (c) Application of Correct Standards to This Case

The record in this case discloses that the trial judge applied the correct totality of circumstances test in ruling that defendant's statements were admissible. Our review of the correctness of the judge's ruling, by application of the against the manifest weight of the evidence test, compels affirmance. The fact that defendant's mother was allegedly unable to speak to defendant prior to interrogation is one factor to consider in the totality of the circumstances, as is the fact that a youth officer was not present when defendant gave her first

statement. These factors are overridden, however, by the remainder of the evidence which showed that defendant's confession was freely given, without threats, promises, inducements, or physical coercion. Defendant was given food when she requested it, treated well by the police, and had no complaints about her treatment. She could read and understand English, she understood her written statement, she made corrections to it, and she signed it. She did not appear to the officers, the assistant State's Attorney, or the youth officer to be under the influence of alcohol or other drugs. There was no evidence that she asked to speak to her mother. The clarity of her statements, particularly the detail contained in the statement given to the court reporter, belied the testimony of her mother that she was nearly incomprehensible. The bravado displayed by defendant for the sake of television cameras, a videotape of which was shown to the jury, also belied her mother's testimony and was consistent with the conscious actions of a defiant person who was in control, not those of a youngster in a coercive environment.

The majority relies heavily on the fact that no one was called to rebut the testimony of defendant's mother. Without regard to the inherent difficulties in proving a negative and without regard to the fact that everyone addressing this issue in the circuit court—judge, prosecutor, and defense attorney—applied the totality of circumstances test and saw the noncontact between mother and defendant as only a consideration, the majority places too much reliance on the fact that the evidence was uncontradicted. The circuit court is in a superior position to evaluate a witness' credibility when it hears a motion to suppress, and it need not accept the defendant's version of the circumstances in preference to another version. *People v. Cleesen* (1988), 177 Ill. App. 3d 103, 113, 531 N.E.2d 1113, 1119.

Indeed, much of defendant's mother's testimony was incredible. Did the police officers, charged only with the responsibility of notifying the mother of her daughter's whereabouts, really enter her home with drawn guns? Did they refuse to talk to her and insist only on talking to her husband? Did they stay for at least an hour? Why did the police go to her house at all if they did not want her to know that her daughter was in custody and where she could be seen? Did police deny her access to her daughter until 8:30 a.m., even though all statements had been completed by 6:40 a.m.? At 8:30 a.m., after having given a coherent statement to a court reporter and minutes before performing for television cameras, was her daughter gagging, incomprehensible, and unaware?

Although pointing out "the danger of cursory application of principles to facts" (273 Ill. App. 3d at 850), without analysis the

majority suppresses all of defendant's statements, through its broad application of its *per se* rule. In doing so, the majority leaves important questions unanswered. For example, in view of the evidence that the detectives were talking to defendant at about the same time other officers were visiting her mother, can it be said that defendant's first statement was tainted by her mother's allegation that she was told not to go to the police station until she was called? If so, the majority's unarticulated *per se* rule is even broader than it first appears. Also, in view of the fact that defendant had already given her oral statement to the assistant State's Attorney by the time defendant's mother arrived at the police station at 2 a.m., how was that statement tainted by the alleged rebuff of her mother at the police station?

Considering the totality of the circumstances, there is ample evidence in the record to support the trial judge's determination even if it be conceded, for the sake of argument, that defendant's mother was denied access to her. Since the opposite conclusion is not clearly apparent, the ruling of the trial judge on the motion to suppress should be upheld and the judgment in this case should be affirmed.